HERBERT G. BURKERT ET AL. *v.* PETROL PLUS OF NAUGATUCK, INC., ET AL.
(13732)

PETERS, C. J., GLASS, COVELLO, HULL and BORDEN, Js.

Argued May 8—decision released July 31, 1990

*Robert B. Yules,* for the appellant (named defendant-third party plaintiff).

*Philip S. Walker,* with whom were *Robin S. Linker* and, on the brief, *Karen L. Goodwin,* for the appellee (third party defendant General Motors Corporation).

PETERS, C. J. The principal issue in this appeal is whether the distributor of a defective product is entitled to indemnification against the licensor of a trademark under which the allegedly defective product was marketed, when the trademark licensor did not participate in the production, marketing or distribution of the product. The first party plaintiffs initiated this action to recover for damages allegedly caused by defective automatic transmission fluid that the plaintiffs purchased from the named defendant, Petrol Plus of Naugatuck,

Inc. (Petrol Plus).[1] Petrol Plus filed third party complaints seeking indemnification against Atlantic Coast Oil Company (Atlantic Coast) and General Motors Corporation (GM).[2] After the first party actions were settled, the third party claims were tried to a jury. Following the trial, the trial court accepted the jury verdicts and rendered judgment in favor of the third party defendant GM but against Atlantic Coast. The court ordered Atlantic Coast to pay compensatory damages in the amount of $1,020,000, plus $510,000 in punitive damages and $60,597 for attorney's fees. Petrol Plus appealed only the judgment in favor of GM, and we transferred the case from the Appellate Court to ourselves pursuant to Practice Book § 4023. We affirm the judgment of the trial court.

The facts relevant to this appeal are undisputed. The allegedly defective product in this case was automatic transmission fluid, a lubricant composed of base oil and a complex combination of additives designed to withstand the intense conditions of a motor vehicle automatic transmission. Atlantic Coast and Petrol Plus marketed the transmission fluid as Dexron® II, a registered trademark owned by GM. Dexron® II, one of only two types of automatic transmission fluids currently on the market, is approved for use in most motor vehicle automatic transmissions.

[1] This lawsuit began as twelve separate actions, in which the original plaintiffs were Herbert G. Burkert d/b/a Aamco Transmissions, Marbro Corporation d/b/a Aamco Transmissions, Trans-Co of CT, Inc., d/b/a Aamco Transmissions, Uptown, Inc., d/b/a Aamco Transmissions, HNS Management, Inc. (a/k/a Connecticut Transit), Mister Transmission, Inc., Dennis Kealey d/b/a Den Jo Automatic Transmissions, Vuoso Enterprises, Inc., d/b/a Lee Myles Transmissions, Levine's Transmissions & Automotive Parts, Inc., Transmissions Plus, Inc., Michael Bartram d/b/a National Transmissions, Russell Lincoln d/b/a Norwalk Transmission Service, J. P. of Connecticut, Inc., d/b/a Stop & Go Transmissions, Connecticut Automatic Transmission, and Fred's Auto Service, Inc. By consent of the parties, the twelve actions were consolidated into the present case.

[2] GM also filed a cross complaint against Atlantic Coast, but later withdrew that action.

Although the parties dispute several of the details of GM's involvement in the case, it is clear, even taking Petrol Plus' statement of facts as true, that GM's role as a trademark licensor was unusually limited. GM operates a licensing program by which it permits third parties to use the Dexron® II trademark on specific formulations of automatic transmission fluids meeting GM's performance standards.[3] To qualify as Dexron® II, a lubricant must pass twenty separate performance tests at one of two GM approved laboratories. GM exercises no control over the actual formulations that its licensees use to meet these performance standards, however, and the physical and chemical properties of the transmission fluid therefore vary among producers. Indeed, no one at GM knows the actual makeup of the licensees' various formulations of Dexron® II, since licensees consider their transmission fluid formulas to be trade secrets.

Significantly, GM receives no royalties or other financial benefits from the licensing program. GM established the Dexron® II trademark program not as a marketing scheme to generate income or to promote GM's visibility in the marketplace, but rather as a quality control measure to ensure an adequate supply of suitable lubricant to meet its needs. Once it grants a license, GM does little to supervise the production and distribution of Dexron® II. According to Petrol Plus, GM never provided its licensees with educational literature or seminars on production and quality control matters. GM also did not require its licensees to submit samples or test data to determine whether the

---

[3] There are three types of licenses under the Dexron® II program. An "original formulator" is licensed to develop and produce its own proprietary automatic transmission fluid formulation. A "reblender's" license permits a licensee to blend base stock and an additive supplied by an original formulator to produce automatic transmission fluid. Finally, GM licenses "rebranders" who may sell transmission fluid produced by an original formulator or a reblender as their own brand of Dexron® II.

transmission fluid being marketed as Dexron® II met GM's performance specifications, and did not undertake to warn purchasers of potential problems with the product.[4]

Petrol Plus, a petroleum products distributor, sold transmission fluid as Dexron® II to automatic transmission repair shops and to Connecticut Transit. Petrol Plus obtained this transmission fluid from Atlantic Coast, which held a "rebrander's license" from GM. Atlantic Coast's rebrander's license, in turn, entitled it to purchase transmission fluid bearing a specified identification number from Sun Oil Company, which operated under an original formulator's license. Atlantic Coast "rebranded" the transmission fluid purchased from Sun Oil Company as "Kenmore" Dexron® II.[5]

Beginning in 1981, Petrol Plus purchased one quart containers of Kenmore Dexron® II from Atlantic Coast for resale to its customers. In 1983, Petrol Plus began purchasing transmission fluid in 5000 gallon amounts that Atlantic Coast delivered in bulk. In all, Petrol Plus accepted four bulk loads during the period between May and August of 1983.

---

[4] GM contends that it does, however, seek either termination of the license agreement or other corrective action when it receives information that a particular licensee is marketing defective transmission fluid. In this case, for example, GM persuaded Atlantic Coast to surrender its license and terminate distribution of the defective transmission fluid in the wake of the discovery that Atlantic Coast had distributed a lubricant other than that specified in its license agreement. Although it is not clear to what extent Petrol Plus disputes GM's claim on this subject, we need not resolve this question for the purpose of this opinion.

[5] The complete legend appearing on Atlantic Coast's automatic transmission fluid containers read as follows: "Kenmore DEXRON® II, Automatic Transmission Fluid: Provides maximum resistance to oxidation, corrosion, rusting, foaming. DEXRON Registered. Assures smooth quiet action at all times. Meets DEXRON specifications. Approval No. D20898. Approved for use in all General Motors, Chrysler, and American Motors Cars. Atlantic Coast Oil Company, Glendale, New York 11385."

During June, 1983, one of Petrol Plus' customers complained about the color of the Dexron® II. In response, Petrol Plus commissioned Ana Laboratories, Inc., to test the suspect transmission fluid. Although Ana Laboratories is not one of GM's authorized testing facilities, Petrol Plus notified the complaining customer that Ana Laboratories had concluded that the fluid was "satisfactory for use." Later tests conducted after receipt of many additional customer complaints reached differing conclusions. In light of these results, Petrol Plus suspended distribution of the bulk transmission fluid in August and notified its customers by letter that they should terminate all use of the product. Further inquiry revealed that Atlantic Coast had not been supplying the approved Sun Oil Company lubricant. In lieu of the approved formulation, Atlantic Coast had supplied Petrol Plus with a base oil, dyed red to make it look like Dexron® II.[6]

In its third party complaint against Atlantic Coast and GM, Petrol Plus claimed that it was entitled to common law indemnification for the settlement moneys and other expenses incurred in settling the first party actions for damages caused by the defective transmission fluid. The complaint set forth five counts for indemnification including negligence, strict tort liability, breach of implied warranties of merchantability and fitness for a particular purpose and breach of an express warranty. In addition, Petrol Plus alleged three other counts for compensatory and punitive damages for its alleged economic losses based on recklessness, misrepresentation and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes 42-110a et seq.[7]

---

[6] Automatic transmission fluid is dyed red to aid mechanics in determining whether the source of a lubricant leak is the engine or the transmission.

[7] Petrol Plus also pleaded a breach of contract claim against Atlantic Coast only.

Following the parties' submission of proposed jury instructions, the trial court opted to give separate instructions on the counts against Atlantic Coast and on those against GM. In its charge on the counts against GM, the trial court instructed the jury to determine, as a threshold matter, whether GM was a product seller as defined by the Product Liability Act; General Statutes §§ 52-572m through 52-572r; notwithstanding Petrol Plus' objection that it had not pleaded the statute. The trial court refused to instruct the jury on Petrol Plus' recklessness, misrepresentation and CUTPA claims against GM, but denied GM's motion for a directed verdict on the remaining counts. The jury found in favor of GM on all counts, but returned a verdict against Atlantic Coast in the amount of $1,020,000, after having concluded that Petrol Plus was 15 percent responsible for the total damages of $1,200,000. The court accepted the jury's verdicts, and thereafter granted Petrol Plus' motion for punitive damages and awarded an additional $510,000, plus $60,597 for attorney's fees against Atlantic Coast.

On appeal, Petrol Plus challenges the trial court's judgment in favor of GM on three grounds. First, it contends that the court should have held, as a matter of law, that GM was a "product seller" for purposes of the Product Liability Act, rather than leaving that question for the jury to resolve. Second, Petrol Plus argues that the court's instructions on its common law theories of indemnity were unduly restrictive. Finally, Petrol Plus contends that the court wrongly failed to charge the jury on its CUTPA claim against GM.

I

Petrol Plus first contends that the trial court should not have treated the issue of whether GM was a "product seller" under the Product Liability Act as a question of fact. Instead, Petrol Plus argues, the court

should have ruled that GM was a product seller and instructed the jury that, as a matter of law, GM was liable to Petrol Plus under the statute. GM, by contrast, agrees that the question should not have been left to the jury, but contends that, as a mere trademark licensor, it did not fit within the statutory definition of a product seller. On this theory, GM argues, the court should have granted its motion for a directed verdict, since the Product Liability Act is the exclusive remedy for harm caused by a defective product. While we agree that GM was not, as a matter of law, a product seller under the Product Liability Act, we conclude that the statute does not preclude an injured party from asserting a claim for indemnification against a non-seller.[8]

The Product Liability Act defines a product seller as "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term 'product' seller also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products." General Statutes § 52-572m (a). Plainly, GM was not the manufacturer, wholesaler, distributor, retailer, lessor or bailor of the defective transmission fluid, and was not otherwise "engaged in the business of selling" the product. GM did no more than allow others to use its Dexron® II trademark in the production, marketing and distribution of transmission fluid. Absent any further involvement in the stream of commerce, we conclude that a trademark licensor is not a seller under the Product Liability Act.

---

[8] This court has previously addressed the availability of indemnification under the Product Liability Act in *Kyrtatas* v. *Stop & Shop, Inc.*, 205 Conn. 694, 702–703, 535 A.2d 537 (1988), and *Malerba* v. *Cessna Aircraft Co.*, 210 Conn. 189, 198, 554 A.2d 287 (1989). These cases are inapplicable to this case, however, since we conclude that the Product Liability Act does not govern the case.

That GM is not a product seller does not, however, preclude Petrol Plus from pursuing its claims of negligence, strict tort liability and breach of warranty against GM. We have recently held that the Product Liability Act is "an exclusive remedy for claims falling within its scope." *Winslow* v. *Lewis-Shepard, Inc.,* 212 Conn. 462, 471, 562 A.2d 517 (1989). In that case, however, we expressly limited our holding to claims falling within the scope of the statute. Id. Since the statute provides only that it is the exclusive remedy for "claims against product sellers"; General Statutes § 52-572n (a); we conclude that the statute does not foreclose common law claims against those who are not product sellers and therefore does not bar Petrol Plus' indemnification claims against GM.[9]

## II

Petrol Plus' principal contention on appeal is that the trial court improperly instructed the jury on each of its common law indemnification counts against GM. In support of its challenge to the court's instructions, Petrol Plus asserts three separate theories upon which it claims GM should be held liable in indemnity. First, Petrol Plus contends that GM had an affirmative duty to police its licensees in the production and distribution of Dexron® II by virtue of the Lanham trademark act; 15 U.S.C. § 1051 et seq.; and that GM's breach of this duty amounted to negligence. Second, Petrol Plus argues that, as a trademark licensor, GM was so involved in the stream of commerce that it should be held liable as an "apparent manufacturer" under theories of negligence and strict tort liability. Third, Pet-

---

[9] We find further support for this conclusion in *Gentile* v. *Altermatt,* 169 Conn. 267, 286–87, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976), in which we held that the legislature can limit the availability of certain constitutionally incorporated common law causes of action only if some form of legal recourse for injured parties is retained.

rol Plus contends that GM should be held liable in indemnity for breach of implied warranties of merchantability and fitness for a particular purpose as well as breach of an express warranty. We conclude that Petrol Plus is not entitled to indemnification under any of these theories.

Before turning to Petrol Plus' particular theories of liability, we note that a party is entitled to indemnification, in the absence of a contract to indemnify, only upon proving that the party against whom indemnification is sought either dishonored a contractual provision or engaged in some tortious conduct. *Kaplan* v. *Merberg Wrecking Corporation,* 152 Conn. 405, 411, 207 A.2d 732 (1965). We have also consistently held that, if a claim for indemnification is grounded in tort, reimbursement is warranted only upon proof that the injury resulted from the "active or primary negligence" of the party against whom reimbursement is sought. Id., 415. Such proof requires a plaintiff to establish four separate elements: "(1) that the other tortfeasor was negligent; (2) that his negligence, rather than the plaintiff's, was the direct, immediate cause of the accident and injuries; (3) that he was in control of the situation to the exclusion of the plaintiff; and (4) that the plaintiff did not know of such negligence, had no reason to anticipate it, and could reasonably rely on the other tortfeasor not to be negligent." *Kyrtatas* v. *Stop & Shop, Inc.,* 205 Conn. 694, 698, 535 A.2d 357 (1988); *Kaplan* v. *Merberg Wrecking Corporation,* supra, 416; see also *Malerba* v. *Cessna Aircraft Co.,* 210 Conn. 189, 198, 554 A.2d 287 (1989); *Therrien* v. *Safeguard Mfg. Co.,* 180 Conn. 91, 95, 429 A.2d 808 (1980). The question, then, is whether Petrol Plus has presented any theory of contractual or tortious liability that would support an indemnification award against GM.

## A

We turn first to Petrol Plus' contention that GM had an affirmative duty, by virtue of the Lanham trademark act, to police its licensees in the production, marketing and distribution of Dexron® II. According to Petrol Plus, the federal case law interpreting the Lanham Act stands for the proposition that a trademark licensor must exercise control over its licensees and over the quality of the product bearing its trademark. Thus, Petrol Plus argues, GM's failure to implement such a quality control system amounts to negligence and entitles Petrol Plus to indemnification against GM. We disagree.

In support of its argument that GM was negligent in failing to exercise control over its Dexron® II licensees, Petrol Plus relies upon a line of federal cases beginning with the decision of the Second Circuit Court of Appeals in *Dawn Donut Co.* v. *Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir. 1959). In *Dawn Donut Co.* and its progeny, federal courts have held that "the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees . . . ." Id., 366; *Kentucky Fried Chicken Corporation* v. *Diversified Packaging Corporation,* 549 F.2d 368, 386-87 (5th Cir. 1977).

Petrol Plus' reliance on these cases is misplaced. The rule that a trademark licensor must exercise control over its licensees arises in the context of litigation over whether a trademark owner has abandoned its rights to the trademark, a question that turns in part upon whether the owner has in fact implemented measures to prevent deceptive uses of the trademark. *Kentucky Fried Chicken Corporation* v. *Diversified Packaging Corporation,* supra; *Dawn Donut Co.* v. *Hart's Food*

*Stores, Inc.,* supra, 366–67; *Huntington National Mattress Co.* v. *Celanese Corporation of America,* 201 F. Sup. 938, 945 (D. Md. 1962); *Morse-Starrett Products Co.* v. *Steccone,* 86 F. Sup. 796, 805 (N.D. Cal. 1949).[10] Likewise, the statutory provision on which these cases are based provides only that a trademark is subject to cancellation "on the ground that the registrant (A) does not control, or is not able legitimately to exercise control over, the use of such mark . . . ." 15 U.S.C. § 1064 (5) (A). Under this body of law, the sole consequence of a trademark owner's failure to exercise control over its licensees is the potential loss of the rights associated with the trademark. None of these cases suggests, in any way, that a trademark owner's failure to exercise control subjects the owner to affirmative liability in tort for damages caused by a defective product bearing its trademark. See also S. Sandrock, "Tort Liability of a Non-Manufacturing Franchisor for Acts of Its Franchisee," 48 U. Cinn. L. Rev. 699, 706 (1979).

Moreover, even if GM's failure to exercise control over its Dexron® II licensees did constitute negligence, Petrol Plus is not entitled to indemnification on this ground because it has failed to establish that GM's conduct was the active or primary cause of the damages. See *Kaplan* v. *Merberg Wrecking Corporation,* supra, 416. According to Petrol Plus, GM was negligent in failing to provide its licensees with information and instruction on production methods, in failing to require

---

[10] The duty to control under the Lanham Act has also arisen, on occasion, in the context of antitrust litigation. In these cases, a trademark owner defends against allegations of anticompetitive activity by arguing that its actions were required by the Lanham Act. See, e.g., *Siegel* v. *Chicken Delight, Inc.,* 448 F.2d 43, 51–52 (9th Cir. 1971), cert. denied, 405 U.S. 955, 96 S. Ct. 1172, 31 L. Ed. 2d 232 (1972); *Denison Mattress Factory* v. *Spring-Air Co.,* 308 F.2d 403, 409 (5th Cir. 1962); *McAlpine* v. *Aamco Automatic Transmissions, Inc.,* 461 F. Sup. 1232, 1239–40 (E.D. Mich. 1978); *Susser* v. *Carvel Corporation,* 206 F. Sup. 636, 645 (S.D.N.Y. 1962), aff'd, 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S. Ct. 1364, 14 L. Ed. 2d 284 (1965).

the submission of samples or test data to ensure the final product met the Dexron® II performance specifications and in failing to warn purchasers of potential problems with the product. In contrast to Atlantic Coast's active conduct in substituting a base oil, dyed red, for the Sun Oil Company formulation specified in the license agreement, GM's lack of affirmative action to ensure the quality of Dexron® II might constitute nonfeasance, but it is by no means the primary or active cause of the damage in this case. Indeed, Petrol Plus' claim that GM was negligent in failing to exercise control over its licensees belies any claim that GM was "in control of the situation," an essential condition of establishing an entitlement to indemnification. *Kyrtatas* v. *Stop & Shop, Inc.,* supra, 698.

## B

Petrol Plus next contends that it is entitled to indemnification from GM, even if GM had no affirmative duty to control its licensees, under theories of negligence and strict tort liability. Central to both of these claims is Petrol Plus' assertion that, as the licensor of the trademark under which the defective product was distributed, GM should be treated as a manufacturer of the defective Dexron® II for purposes of tort liability, notwithstanding the fact that GM had no role in the physical production of the transmission fluid. We disagree.

A nonmanufacturer may under certain circumstances be held liable in the same manner as a manufacturer or seller of a defective product. See *Burkhardt* v. *Armour & Co.,* 115 Conn. 249, 264–65, 161 A. 385 (1932); 2 Restatement (Second), Torts § 400 (1965). Under the so-called apparent manufacturer doctrine of § 400 of the Restatement, "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its

manufacturer."[11] Relying on comment (d) to § 400, which provides that "one puts out a chattel as his own product when he . . . affixes to it his trade name or trademark," Petrol Plus argues that GM's agreement to allow others to use the Dexron® II trademark is tantamount to putting out the automatic transmission fluid as GM's own product. By this hypothesis, GM would be liable, like an actual manufacturer of a defective product, under theories of negligence and strict tort liability.

Petrol Plus' argument fails, however, to recognize the threshold requirement of § 400 that the non-manufacturer can be held liable only if it indeed "[put] out a chattel." Comment (a) to § 400 defines "one who puts out a chattel" as "anyone who supplies it to others for their own use or for the use of third persons, *either by sale or lease or by gift or loan*." (Emphasis added.) That § 400 is entitled *"Selling as Own Product Chattel Made by Another"* (emphasis added) provides further support for the conclusion that the section applies only to those involved in the sale, lease, gift or loan of products. Comment (d), on which Petrol Plus relies, addresses only whether one who has in fact "put out" a product sold it as "his own." Since GM was in no way involved with the sale, lease, gift or loan of the defective automatic transmission fluid, we conclude that GM did not "put out" the defective Dexron® II, and is therefore not liable as an apparent manufacturer under § 400.

[11] Some courts have also imposed liability against nonmanufacturers on a "stream of commerce" theory without reference to the apparent manufacturer doctrine. See *Kosters* v. *Seven-Up Co.,* 595 F.2d 347, 352 (6th Cir. 1979); *Taylor* v. *General Motors, Inc.,* 537 F. Supp. 949, 953 (E.D. Ky. 1982); *Kasel* v. *Remington Arms Co.,* 24 Cal. App. 3d 711, 723, 101 Cal. Rptr. 314 (1972). The analysis underlying this theory, however, does not differ in any significant way from the apparent manufacturer doctrine. See *Hartford* v. *Associated Construction Co.,* 34 Conn. Sup. 204, 215–17, 384 A.2d 390 (1978).

Petrol Plus asserts, however, that two Connecticut cases; *Burkhardt* v. *Armour & Co.*, supra, and *Hartford* v. *Associated Construction Co.*, 34 Conn. Sup. 204, 215–17, 384 A.2d 390 (1978); stand for the proposition that the apparent manufacturer doctrine applies even to trademark licensors that are not involved in the production, marketing, or distribution of the defective product. We are unpersuaded.

*Burkhardt* v. *Armour & Co.*, supra, upheld the imposition of liability against a trademark licensor, but only upon proof that the licensor had substantial additional involvement in the distribution of the injury causing product. The trademark licensor in that case had caused the product to be produced and had actually taken title to the product in the process of distribution. Id., 264. Further, the court noted that the prominence of the trademark would have led a purchaser to believe that the licensor had itself produced the goods. Id. In the present case, by contrast, GM's only involvement in the stream of commerce was its agreement to allow Atlantic Coast to use the Dexron® II trademark on its automatic transmission fluid. Although the Dexron® II trademark did appear on Atlantic Coast's packaging, Atlantic Coast also used its own trade name "Kenmore" on the containers. GM did not, as Petrol Plus itself has emphasized, exercise control over the manufacture of the product, and never participated in any way in the distribution of the product.

Petrol Plus' reliance on *Hartford* v. *Associated Construction Co.*, supra, is similarly misplaced. Relying in part on § 400, the Superior Court held that a trademark licensor could be strictly liable for damages caused to a school building from defective roof material that a third party had applied to the building. Id., 214–16. The trademark licensor in that case, however, had not only received fees for the use of its trademark, but had also retained and exercised rights of control both as to the

quality of the product and as to the method of its application. Id., 205. In addition, the trademark licensor had supplied a component material necessary for the manufacture of the product, and had derived substantial economic benefit from the license agreement. Id.

Petrol Plus also cites several cases from other states in support of its contention that GM's status as a trademark licensor brings it within the ambit of the apparent manufacturer doctrine. Although two of these cases do interpret § 400 as imposing liability on a trademark licensor with no additional involvement in the stream of commerce; see *Carter* v. *Joseph Bancroft & Sons Co.*, 360 F. Sup. 1103, 1107 (E.D. Pa. 1973); *Connelly* v. *Uniroyal, Inc.*, 75 Ill. 2d 393, 410–11, 389 N.E.2d 155 (1979), cert. denied and appeal dismissed, 444 U.S. 1060, 100 S. Ct. 992, 62 L. Ed. 2d 738 (1980);[12] most cases impose liability only after finding that the licensor had a significant role in the chain of distribution.[13] *Kasel* v. *Remington Arms Co.*, 24 Cal. App. 3d 711, 717–19, 101 Cal. Rptr. 314 (1972), for example, imposed liability on a trademark licensor that had also been principally responsible for the formation of the entity that manufactured the product and continued to own 40 percent of its stock and to supply the company with critical personnel and equipment. The trademark licensor there also received royalties under a license agreement as well as fees for consulting services for production and marketing technique, and engaged in an active

[12] We note, however, that *Connelly* v. *Uniroyal, Inc.*, 75 Ill. 2d 393, 408, 389 N.E.2d 155 (1979), cert. denied and appeal dismissed, 444 U.S. 1060, 100 S. Ct. 992, 62 L. Ed. 2d 738 (1980), differs from the present case in that the trademark licensor received financial benefit in return for granting permission to use its trademark.

[13] Petrol Plus also cites *Gizzi* v. *Texaco, Inc.*, 437 F.2d 308 (3d Cir.), cert. denied, 404 U.S. 829, 92 S. Ct. 65, 30 L. Ed. 2d 57 (1971), as supportive of its apparent manufacturer claim against GM. This case is inapposite, however, since it turns not on whether the defendant was the apparent manufacturer, but instead on whether the defendant could be held liable on a theory of agency based upon apparent authority. Id., 309.

advertising campaign to promote sales of the product. Id., 718–20; *Escola* v. *Coca Cola Bottling Co.*, 24 Cal. 2d 453, 456, 150 P.2d 436 (1944) (trademark licensor also the bottler and distributor of the defective bottle); *Rubbo* v. *Provision Co.*, 138 Ohio St. 178, 180–81, 34 N.E.2d 202 (1941) (defendant was also retailer of the product); see also *Taylor* v. *General Motors, Inc.*, 537 F. Sup. 949, 954 (E.D. Ky. 1982) (trademark licensor exercised strict control over the specific design of the product, conducted durability tests on sample finished products, directed the actual manufacturer as to the timing and amount of its production and installed the finished product as a component in the automobiles that it produced).

Several courts in other jurisdictions have explicitly noted that the imposition of liability against a trademark licensor under the apparent manufacturer doctrine is appropriate only when the licensor is significantly involved in the manufacturing, marketing or distribution of the defective product. In *Kasel* v. *Remington Arms Co.*, supra, 725, the court distinguished the case of a mere product endorser, saying that the application of tort liability would be appropriate only "as long as the franchisor or trademark licensor can be said to be a link in the marketing enterprise." Likewise, the court in *Torres* v. *Goodyear Tire & Rubber Co.*, 163 Ariz. 88, 94, 786 P.2d 939 (1990), explicitly left open the issue of whether a party that merely licenses a trademark could be held liable for damages caused by the product, and held Goodyear liable because "Goodyear is anything but a mere licensor. On the present record before us, the undisputed facts certainly could support a finding that Goodyear participated significantly in the design, manufacture, promotion, and sale that resulted in the product reaching the consumer." See also *Affiliated FM Ins. Co.* v. *Trane Co.*, 831 F.2d 153, 155–56 (7th Cir. 1987) (designer of a

defective product not liable because the apparent manufacturer doctrine is inapplicable where a party is not involved in the manufacture, sale or installation of the product); *Stanford* v. *Dairy Queen Products of Texas,* 623 S.W.2d 797, 805 (Tex. App. 1981) (trademark licensor that did no more than authorize others to use the trade name "was not the actual 'vendor' of the [defective product] to which § 400 of the Restatement imputes the actual manufacturer's liability"); Am. Law Prod. Liab. 3d (1987) § 5:18, p. 36 (imposition of liability against trademark licensor is appropriate "[a]s long as a franchisor or trademark licensor can be said to be a link in the marketing enterprise . . ."); L. Frumer & M. Friedman, Products Liability (1989) § 3.03 [4] [b] [viii], pp. 3-353–58.

We therefore conclude that GM's status as a trademark licensor, without more, does not render GM liable under the apparent manufacturer doctrine. Although it is ordinarily a question of fact whether a party was, under the circumstances of a particular case, the apparent manufacturer of a defective product; Am. Law Prod. Liab. 3d (1987) § 6:1; we conclude that the absence of any involvement on the part of GM in the production, marketing or distribution of the defective transmission fluid in this case precludes, as a matter of law, a finding that GM was an apparent manufacturer. Accordingly, we hold that Petrol Plus is not entitled to indemnification under its strict tort liability and negligence claims.

## C

Our conclusion that GM was not sufficiently involved in the stream of commerce to warrant the imposition of tort liability disposes of Petrol Plus' claim that it should be entitled to indemnification for breach of implied warranties of merchantability and fitness for a particular purpose and for breach of an express war-

ranty. Under the Uniform Commercial Code, a party is entitled to recovery under these warranty theories only against a seller or, in the case of an implied warranty of merchantability, against a merchant. See General Statutes §§ 42a-2-313 through 42a-2-315. General Statutes § 42a-2-103 (1) (d), in turn, defines "seller" as a "person who sells or contracts to sell goods." Since we have already concluded, in our discussion of the applicability of the Product Liability Act, that GM was not a "person or entity . . . who is engaged in the business of selling," we hold that Petrol Plus cannot recover under the Uniform Commercial Code warranty provisions since GM is not a seller as defined in § 42a-2-103 (1) (d). See *Therrien* v. *Safeguard Mfg. Co.,* supra, 94–95.

Alternatively, Petrol Plus maintains, that it should be able to recover under a common law theory of warranty. We recognize that the comments to the code indicate that "the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." Uniform Commercial Code § 2-313, comment (2). We conclude, however, that Petrol Plus is not entitled to recovery under such a theory since the only cases holding that a trademark licensor can be held liable under a common law warranty theory, like the tort liability cases, rest upon a predicate finding of far more substantial participation in the stream of commerce than is involved in this case. *Harris* v. *Aluminum Co. of America,* 550 F. Sup. 1024, 1028 (W.D. Va. 1982) (common law implied warranty applicable "to a franchisor who causes a product to enter the stream of commerce, engages in extensive advertising to promote the sales of the product, and controls the specifications and requirements of the product"); *Mahan Volkswagen, Inc.* v. *Hall,* 648 S.W.2d

324, 329 (Tex. App. 1982) (common law warranty theory applied to manufacturer of automobile, notwithstanding the fact that car was used and had been repaired by a third party).[14] Since GM had no further involvement in the stream of commerce than licensing its trademark, we hold that Petrol Plus cannot recover against GM under a theory of common law warranty.

To summarize our discussion on the availability of recovery under a common law indemnity theory, we have determined, as a matter of law, that Petrol Plus has failed to establish that it is entitled to recovery against GM on its theories of negligence, strict tort liability, and breach of warranty. In the absence of any underlying tortious or contractual liability, we conclude that Petrol Plus is not entitled to idemnification against GM.

## III

In its final challenge to the trial court's judgment, Petrol Plus argues that the court improperly refused to charge the jury on the CUTPA claim directed against GM. According to Petrol Plus, GM's failure to implement a quality control system or to warn purchasers of potential problems with automatic transmission fluid bearing the Dexron® II trademark, despite GM's knowledge that some of its licensees had misused the trademark, afforded sufficient evidence of unfair and deceptive trade practices to require an instruction charging the jury to consider whether GM's conduct warranted an award of compensatory and punitive damages. We disagree.

---

[14] Petrol Plus also cites *Kosters* v. *Seven-Up Co.*, 595 F.2d 347 (6th Cir. 1979), in support of its common law warranty claim. *Kosters* is, however, inapplicable to the present case by its express terms. The court expressly refrained from addressing the situation in which a "franchisee . . . [sells] a product contrary to the instructions or without the knowledge of the franchisor." Id., 352. In the present case, Atlantic Coast substituted a different material from the Sun Oil Company formulation specified in its license agreement.

The unfair trade practices statute provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices *in the conduct of any trade or commerce.*" (Emphasis added.) General Statutes § 42-110b (a). The statute further defines "trade or commerce," in § 42-110a (4), as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property . . . or thing of value in this state." The statute thus applies, by its terms, only to parties that have engaged in the advertising, selling, renting, leasing or distribution of goods. There is no evidence that GM at any time advertised the Dexron® II trademark. We have already determined that GM was in no way involved in the sale, renting, leasing or distribution of the defective transmission fluid in this case.[15] Accordingly, we hold that the trial court properly refused to charge the jury on Petrol Plus' CUTPA count against GM.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[15] We note also that Petrol Plus has not cited any authority interpreting the Federal Trade Commission Act, 15 U.S.C. § 45 (a) (1) et seq., that might guide us in determining whether a trademark licensor falls within the scope of CUTPA. See General Statutes § 42-110b (b). We note, however, that the federal statute does not contain a limitation in its scope to acts of "trade or commerce" in the manner that CUTPA defines those terms. 15 U.S.C. § 45 (a) (1).