[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO STRIKE
In this case, plaintiff Victoria Bobryk, a minor, and co-plaintiff Dawn Bobryk, her mother and next friend, have sued the defendant, Lincoln Amusements, Inc., to recover damages for certain losses they claim to have suffered as a result of the plaintiff's violent fall, on July 20, 1994, from a carnival ride owned and operated by the defendant. In the first and second counts of their four-count Amended Complaint ("A.C."), the plaintiffs allege that the defendant is liable for their losses under General Statutes § 52-572m et seq., the CT Page 185 Connecticut Products Liability Act ("CPLA"). They allege, more particularly, that the defendant is liable under the CPLA because: (1) "[a]t all times [relevant to this case], the [d]efendant . . . was the owner and operator of an amusement park ride called the "Chair Plane a/k/a Flying Chairs," ("the ride") which they provided and operated as one of the rides at a carnival sponsored by the Simsbury Volunteer Fire Company[;]" A.C., Count I ¶ 3, Count II ¶ 3; (2) "[a]t all times [relevant to this case], the [d]efendant was a `product seller' as defined in [Section] 52-572m, . . . engaged in the business of selling carnival rides, including the `Flying Chairs[,]' for resale, use, consumption, leasing or bailments[;]" A.C., Count I ¶ 4, Count II ¶ 4; (3) "[o]n or about July 20, 1994, the plaintiff-minor purchased a ticket from the [d]efendant to ride the `Flying Chairs'[;]" A.C., Count I ¶ 5, Count II ¶ 5; (4) "said ride was expected to and did reach the [p]laintiff-minor without substantial change in condition from which (sic) it was sold, leased or bailed[,]" A.C., Count I ¶ 7(a), Count II ¶ 7(a); (5) "said ride was in a defective and unreasonably dangerous condition and could not be used without unreasonable risk of injury to the plaintiff minor[;]" A.C. Count I ¶ 7(a), Count II ¶ 7(a); and (6) the plaintiff-minor suffered her complained-of injuries when "putting the ride to its intended use by riding [on it] as a passenger[.]" A.C., Count I ¶ 6, Count II ¶ 6.
The third and fourth counts of the Amended Complaint sound in negligence. In each of them, the plaintiffs allege that the defendant is liable for their respective losses because it proximately caused the plaintiff-minor's fall and resulting injuries by its negligence in the maintenance and operation of the "Flying Chair."
The defendant has now moved the Court to strike the first and second counts of the Amended Complaint, claiming that they fail to state claims upon which relief can be granted under the CPLA. On that score, the defendant argues that the challenged counts are legally insufficient because, by basing their claims of liability on the defendant's alleged sale of a ticket to ride on the "Flying Chairs," they fail to state facts upon which it might properly be found that the defendant ever sold, leased or bailed any product.
The defendant has supported its motion to strike with two memoranda of law. The plaintiffs have responded to the motion CT Page 186 with two opposing memoranda of their own.
 I
A motion to strike is the proper procedural vehicle by which to challenge the legal sufficiency of an opposing party's pleading or any count or claim thereof. Ferryman v.Groton, 212 Conn. 138, 142 (1989). In deciding a motion to strike, the Court must determine whether or not the facts alleged in the challenged claim or count, if presumed to be true and read in the light most favorable to the pleader, are sufficient to prove each essential element of the pleader's defense or cause of action. When making this determination, the Court must consider both the facts expressly pleaded in the challenged pleading and all facts necessarily to be implied therefrom. Id., 143.
On the other hand, it must ignore the pleader's legal conclusions, for they neither constitute allegations of fact nor give rise to any such allegations, by necessary implication or otherwise. Mingachos v. CBS, Inc., 196 Conn. 91,108 (1985).
 II
Under the CPLA, a "product liability claim" is defined as follows:
 "Product liability claim" includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. "Product liability claim" shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or CT Page 187 nondisclosure, whether negligent or innocent.
General Statutes § 52-572m(b). In Section 52-572n(a), the Act further provides that:
 A product liability claim as provided in Sections 52-240a, 52-240b, 52-572m
to 52-572r, inclusive, and 52-577a may be asserted and shall be in lieu of all other claims against sellers,
including actions of negligence, strict liability and warranty, for harm caused by a product.
(Emphasis added.)
Though these statutes can be read to suggest that in an action against a product seller for harm caused by a product, all common-law causes of action remain viable, but must be pleaded, in the alternative, in a single, consolidated count of the plaintiff's complaint, our Supreme Court has authoritatively construed them otherwise. Thus in Winslow v. Lewis-Shepard, Inc., 212 Conn. 462,465-71 (1989), where this very issue was raised and decided, the Court relied principally upon the legislative history of the CPLA to hold that as to product sellers, the Act abolished all common-law causes of action to recover damages for injuries caused by harmful products, and replaced them with a new statutory cause of action which is now the "exclusive remedy for claims falling within its scope." Id., 471.
The essential elements of this new statutory cause of action are not explicitly listed or described in the CPLA. Even so, our Supreme and Appellate Courts have identified them as follows. First, since the CPLA "provides only that it is the exclusive remedy for `claims against product sellers[,]'" Burkert v. Petrol Plus of Naugatuck, Inc.,216 Conn. 65, 73 (1990), the plaintiff must plead and prove that at all times relevant to his action, the defendant was a "product seller" within the meaning of the Act. Under Section 52-572m(a), a "product seller" is
any person or entity, including a CT Page 188 manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.
Second, because the CPLA governs the statutory liability of product sellers "for harm caused by a product," General Statutes § 52-572n(a), the plaintiff must plead and prove that the item which caused him harm was in fact the defendant's "product" within the meaning of the Act. Though the Act does not expressly define the term "product," its above-stated definition of a "product seller" provides persuasive evidence that for the purpose of the Act, a "product" is any item, thing or commodity which, upon acquiring its physical existence and identity, through the process of manufacture or otherwise, is put in the stream of commerce either by sale, for use, consumption or resale, or by lease or bailment. To properly state a cause of action under the CPLA, a plaintiff must therefore allege facts which, if proved at trial, will establish that the thing which caused him harm was a thing which the defendant sold, leased or bailed to or any person,[1] and thereby placed in the stream of commerce. Items entering the stream of commerce by any other means, such as by delivery ancillary to the rendering of a service, are not products within the meaning of the CPLA. Zichichi v.Middlesex Memorial Hospital, 204 Conn. 399, (1987) (holding that the transfer of blood to a patient undergoing treatment is a service, and therefore that the blood itself is not a product).
Fourth and finally, to ensure that product sellers are not made liable for defects which their products acquired after they put them in the stream of commerce, the plaintiff must plead and prove that the product was expected to and did reach its ultimate user or consumer in substantially the same condition as that in which it was sold, leased or bailed by the defendant product seller.
III
CT Page 189
In this case, the defendant claims that the plaintiffs' product liability claims must be stricken because they fail to allege facts upon which it might fairly be established that the plaintiff-minor, Victoria Bobryk, was harmed by the defendant's "product." The question thus presented is whether the First and Second Counts of the plaintiffs' Amended Complaint include allegations that the plaintiff-minor was harmed by any item, thing or commodity which, upon acquiring its physical existence and identity, through the process of manufacture or otherwise, the defendant put in the stream of commerce by sale, lease or bailment to any person.
The terms "sell" and "sale" are not defined in the CPLA. Even so, their meanings in our law are well understood, and must be applied to this statute absent a clear indication to the contrary. Under the Uniform Commercial Code, "A `sale' consists in the passing of title from the seller to the buyer for a price as provided by Section 42a-2-401." General Statutes § 42a-2-106. This definition is fully consistent with Connecticut's common-law understanding that, "A sale implies ownership in the thing sold and a transfer of that ownership to another. . . . It involves the passing of titles." State v. MadRiver Co., 92 Conn. 35, 38 (1917).
Though the First and Second Counts of the Amended Complaint are not models of clarity, their essential factual allegations are readily apparent. According to the plaintiffs, the "product" which proximately caused Victoria Bobryk's injuries was the physical apparatus of the amusement park ride known as the Flying Chairs. If the term "ride," as used in the challenged pleading, were read to mean the intangible life experience of taking a ride on the apparatus in question, the balance of the plaintiffs' allegations — that the ride was "defective;" A.C. Count I ¶ 7(a), Count II ¶ 7(a); that it "reach[ed Victoria Bobryk] without substantial change in condition from wh[en it was] sold, leased or bailed;" id.; and that it had "dangerous properties;" id., Count I ¶ 7(c), (e), Count II ¶ 7(c), (e) — would be utterly nonsensical.
It is equally clear, however, that the plaintiffs do not claim that the defendant ever sold the physical CT Page 190 apparatus known as the Flying Chairs, to Victoria Bobryk or anyone else. Thus, though they confusingly plead that the defendant was "engaged in the business of selling carnival rides such as the `Chair Place a/k/a Flying Chairs,'" id.,
Count I ¶ 4, Count II ¶ 4, the only sale they allege is of a ticket to ride on the Flying Chairs, not a sale of the Flying Chairs itself. Indeed, the plaintiffs allege, and thus admit, that "[a]t all times mentioned" in their Amended Complaint, "the [d]efendant . . . was the owner and operator of . . . the . . . Flying Chairs." A.C., Count I ¶ 3, Count II ¶ 3. Against this background, in the absence of any allegations that the defendant transferred its ownership of the Flying Chairs to another for a fee, the plaintiffs have declined to oppose the instant Motion to Strike on the theory that the challenged counts allege a sale of that allegedly defective apparatus to another person.
It must therefore be determined whether or not the ale of a ticket to ride on the Flying Chairs can be found to constitute the lease or bailment of the apparatus on which the ride was to take place. If it cannot, then the plaintiffs' product liability claims must be stricken for failure to allege each essential element of a statutory claim under the CPLA.
A lease is a contract under which the lessor, for a fee or other valuable consideration, transfers an interest or estate in real or personal property to the lessee for a stated period of time, with a reversion in the owner after the expiration of the lease. Jo-Mark Sand Gravel Co. v.Pantanella, 139 Conn. 598, 601 (1953). A lease is distinguishable from a license. While the former confers a right, during the term of the lease, to exercise exclusive possession of and control over the property in question, assertable even against the lessor, Carroll v.Cooney, 116 Conn. 112, 115 (1933), the latter extends but a "privilege to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission," Laube v. Stevenson, 137 Conn. 469, 473 (1951) (quoting Restatement, 2 Torts § 332), A licensor, unlike a lessor, remains in possession and control of his property for the duration of the license. In this case it is apparent that the plaintiff-minor acquired no more than a license to ride on the Flying Chairs, for at all times CT Page 191 relevant to the plaintiffs' claims, the defendant both owned and operated the physical apparatus on which the ride was to be taken. Since the plaintiff-minor, by purchasing her ticket to ride, acquired no estate or interest in the Flying Chairs itself, she cannot be found to have leased the Flying Chairs for the duration of her ride. For that reason, the Flying Chairs cannot be found to have been a product, within the meaning of the CPLA, on the theory that it was leased to the plaintiff-minor. Appropriately, the plaintiffs make no claim to the contrary in their opposition to the defendant's Motion to Strike.
The final theory on which the challenged counts of the plaintiffs' Amended Complaint might be claimed to allege sufficient facts to support product liability claims under the CPLA is that by paying for her ride on the Flying Chairs, Victoria Bobryk became the bailee of the physical apparatus of the Flying Chairs for the duration of her ride. For the following reasons, however, this theory also is without merit.
Under our law, a bailment involves:
 A delivery of the thing bailed into the possession of the bailee, under a contract to return it to the owner according to the terms of the agreement. . . . A relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions. . . . In a bailment, the owner or bailor has a general property interest in the goods bailed.
B. A. Ballou Co. v. Citytrust, 218 Conn. 749, 753 (1991). In a bailment, an essential element is control. Malone v.Santora, 135 Conn. 286, 290 (1949). CT Page 192
In this case, the plaintiffs' own allegations make it clear that the defendant never bailed the Flying Chairs to the plaintiff-minor since it never relinquished control of them to her at any time. To the contrary, as previously noted, the plaintiffs expressly allege that "[a]t all times mentioned herein," "the [d]efendant was the owner and operator of the . . . Flying Chairs." Because this allegation completely undermines any claim that Ms. Bobryk became the bailee of the Flying Chairs for the duration of her ride, it likewise defeats any claim that the Flying Chairs were the product of the defendant when they allegedly caused her violent fall. See Siciliano v.Capitol City Shows, 475 A.2d 19 (N.H. 1985) (holding, interalia, that a passenger on an amusement park ride is not a bailee of that ride, but a mere licensee who, though she may sue the ride's operator in negligence, may not sue him on the theory of strict products liability).
For all of the foregoing reasons, the defendants Motion to Strike is hereby granted.
Sheldon, J.