Elysa **KEALOHA, Individually and as Next Friend to Gabe Kealoha; Esther Cabalse; Moses Cabalse; Jonnie Cook; David Fredrickson; Barbara Hook; Raymond Hook and Jack Hook, Plaintiffs,**

v.

**E.I. DU PONT DE NEMOURS & COMPANY; Dow Corning Corporation and Doe Entities 1–50 and John Does 1–40, Defendants.**

Civ. No. 92–00282 HMF.

United States District Court, D. Hawaii.

Feb. 24, 1994.

Richard Turbin, Honolulu, HI, Jeanine F. Gisvold, Linda S. Mitlyng, Brayton Gisvold & Harley, Novato, CA, for plaintiffs.

Burnham H. Greeley, Christine E. Kuriyama, Janice T. Futa, Greeley Walker & Kowen, Honolulu, HI, Barry Fish, George L. Paul, Steven Labensky, Edward M. Mansfield, Lewis and Roca, Phoenix, AZ, William O. Dillingham, Dillingham, Murphy, Mathews & Dahlberg, Lucy E. Bettis, Dillingham & Murphy, San Francisco, CA, for defendant E.I. Du Pont de Nemours & Co.

Clyde Wm. Matsui, Kevin P.H. Sumida, Matsui, Chung & Sumida, Honolulu, HI, for defendant Dow Corning Corp.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FONG, District Judge.

### INTRODUCTION

On January 31, 1994 the court heard defendants' E.I. Du Pont de Nemours ("DuPont") and Dow Corning ("Dow") motions for summary judgment. DuPont filed its motion for summary judgment on September 28, 1993. Plaintiffs Elysa Kealoha, Gabe Kealoha, Esther Cabalse, Moses Cabalse, Jonnie Cook, David Fredrickson, Barbara Hook, Raymond Hook and Jack Hook (collectively "plaintiffs") filed a response on November 17, 1993. DuPont filed a reply on December 3, 1993. Plaintiffs filed a surreply on January 24, 1994.

Dow filed its motion for summary judgment on December 1, 1993. Dow filed a supplemental memorandum in support of its motion on January 3, 1994. Plaintiffs filed a statement of no opposition to Dow's motion for summary judgment on January 13, 1994.

## BACKGROUND

Plaintiffs allege they were injured by failure of a medical device known as the Vitek Proplast Interpositional TMJ Implant (the "Implant"). The Implant was used by oral surgeons to correct problems in the temporomandibular joint ("TMJ"). Plaintiffs were recipients of the Implant through their attending oral surgeons.

The Implant was designed and manufactured by Dr. Charles Homsy ("Homsy"), president of a now bankrupt independent medical device manufacturer Vitek, Inc. ("Vitek"). Homsy is a chemical engineer who has been interested in biomedical implants since 1965[1].

In 1968 Homsy invented and patented an implant material called Proplast[2]. Proplast is a porous implant material designed to encourage tissue ingrowth. Homsy/Vitek performed extensive laboratory and clinical tests and studies on Proplast.

In the early 1970's an oral surgeon consultant to Vitek, Dr. John Kent ("Kent"), began experimenting with Proplast sheeting material for use as a disc replacement in the TMJ. These experiments led to the formulation of the Implant. In 1982, Kent reported that the experiments had been successful and recommended the introduction of the Implant[3]. In March 1983, the FDA reviewed and authorized the sale of the Implant.

One of the raw materials used in manufacturing Proplast, polytefluroethylene ("PTFE"), also known as Teflon[4], was sold in bulk by DuPont to Vitek[5]. PTFE is sold by many manufacturers and is an inherently safe and chemically inert material with numerous industrial applications. PTFE has also been successfully used as a raw material in a number of human implants.

Before DuPont agreed to sell PTFE to Homsy for use in making Proplast, DuPont sent a letter to Homsy advising him that it did not make PTFE for medical use and that it had not conducted the necessary detailed long-term studies to determine the suitability of such use. DuPont's letter also advised Homsy of several published reports that indicated that pure PTFE when used as a hip replacement had a tendency to mechanically abrade. Accordingly, DuPont agreed to sell Homsy the PTFE only if he agreed to employ his own medical judgment as to its safety and only if he signed a waiver to this effect. Homsy signed and returned the waiver.

Plaintiffs' complaint alleges causes of action based on negligence, strict liability, breach of warranty, and misrepresentation. Defendant DuPont moves for summary judgment on all counts on the issue of duty claiming that as a raw material supplier, DuPont owed no duty to plaintiffs who were the ultimate consumers of another company's medical device. DuPont advances four sepa-

1. Homsy worked for DuPont from 1959 to 1966 but did no work on the medical applications of any DuPont products while a DuPont employee. Homsy left DuPont to pursue biomedical research at the Methodist Hospital in Houston, Texas where he became the director of the Prothesis Research Laboratory which pioneered work in human implants. Homsy was also a research professor at Baylor College of Medicine and the University of Texas Medical Center. In addition, Homsy has authored more than fifty scientific biomaterials papers in recognized journals, and has given numerous presentations to bioengineers, physicians, surgeons, oral surgeons and dentists.

2. The steps involved in making Proplast include:

(1) Mixing: the polymer and carbon and soluble ingredients are mixed in a high speed mixer suspended in a soluble organic solvent.
(2) Filtration: the mixed slurry is then vacuum filtered.

(3) Compression: the filter cakes from step 2 are compressed at levels between 50 and 3000 pounds per square inch.
(4) Rolling: the filter cake is then run through the nip of heated rolls.
(5) Drying: the stock material is then dried to evaporate any residual solvent.
(6) Sintering: dried stock is then sintered in a heated press at temperatures between 610 F. and 680 F. and pressures between 50 to 5800 pounds.
(7) Leaching: stock is then leached so as to dissolve out the water soluble filler material.
(8) Drying: the stock is then dried in the oven.

3. The Implant was introduced in March of 1983.

4. Teflon is a registered trademark of DuPont.

5. Each Implant contained only a few cents worth of DuPont PTFE; the final Implant was sold for in excess of $50.

rate legal theories to support its claim that it did not owe plaintiff any duty: (1) DuPont owed no duty to assure the safety of Vitek's specialized use of its raw material; (2) DuPont owed no duty because it sold the PTFE to a sophisticated purchaser; (3) there was no duty because DuPont sold raw materials to a FDA-regulated medical device manufacturer that had an independent duty to warn; and (4) DuPont's polymers were substantially changed [6].

Plaintiffs argue that DuPont did owe them a duty because: (1) as a raw material supplier, DuPont was required to warn Vitek and the ultimate consumer of the dangerous applications of its product; (2) Vitek's use of DuPont's trademark Teflon created a duty to plaintiffs; (3) the PTFE supplied by DuPont was not substantially changed by Vitek; (4) Vitek was not a sophisticated purchaser; and (5) approval of the Implant by the FDA did not relieve DuPont of its duty to warn.

Dow moves for summary judgment on all of plaintiffs' claims because, Dow claims, the undisputed facts establish that Dow did not participate in the design, manufacture, sale or distribution of the Implant. While Dow did have a marketing agreement with Vitek, the agreement terminated in March 1981 before the Implant was ever marketed. Plaintiffs do not oppose Dow's motion for summary judgment.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-tled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant need not advance affidavits or similar materials to negate the existence of an issue on which the opposing party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

If the moving party meets its burden, then the opposing party must come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed.R.Civ.P. 56(e); *T.W. Elec.,* 809 F.2d at 630. The opposing party cannot stand on the pleadings nor simply assert that it will discredit the movant's evidence at trial. *Id.* "If the factual context makes the [opposing] party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Arch. Bldg. Prods. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The standard for summary judgment reflects the standard governing a directed verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). When there is a genuine issue of material fact, "the judge must assume the truth of the evidence set forth by the [opposing] party with respect to that fact." *T.W. Elec.,* 809 F.2d at 631. Inferences from the facts must be drawn in the light most favorable to the non-moving party. *Id.*

## DISCUSSION

I. *DuPont's Motion for Summary Judgment*

Under their negligence and strict liability claim, plaintiffs allege that DuPont breached

---

6. Similarly situated plaintiffs across the country have sought to impose liability on DuPont for the alleged deficiencies of the Implant. DuPont's duty argument has been successful in relieving DuPont of liability and summary judgment for DuPont has been granted in twenty-two trial and two appellate decisions in a total of seventeen different states. Two courts have denied DuPont's motion for summary judgment.

a duty to warn [7] of the danger associated with the implant. The elements of both negligence and strict liability are the same with the exception that in negligence the plaintiff must show that the defendant breached its duty of care and in strict liability the plaintiff must show that the product does not meet the reasonable expectations of the ordinary consumer. *Anguiano v. E.I. DuPont de Nemours, Inc.*, 808 F.Supp. 719, 722 (D.Ariz. 1992); *Ontai v. Straub Clinic and Hospital, Inc.*, 66 Haw. 237, 659 P.2d 734 (1983) (sets forth Hawaii law on strict products liability). The distinction between strict liability and negligence lessens in duty to warn cases; under either theory, the issue is whether a warning was required and, if so, if an adequate warning was provided. *Anguiano*, 808 F.Supp. at 722; *Higgins v. E.I. DuPont de Nemours, Inc.*, 671 F.Supp. 1055, 1059 (D.Md.1987).

■ While plaintiffs are correct in asserting that Hawaii law draws a distinction between strict liability and negligent failure to warn claims by rejecting the "state of the art" evidence in the former, this distinction has no bearing on the facts of this case. *See Hegna v. E.I. Du Pont de Nemours, Inc.*, 825 F.Supp. 880, 884 (D.Minn.1993); *Veil v. Vitek*, 803 F.Supp. 229, 234 (D.N.D.1992). In addition, while Hawaii law has a tradition of expansive construction of strict product liability claims [8], the court has found no Hawaii decision holding a bulk distributor of an inherently safe component part liable when that part is used in a defective end product. Accordingly, this is a case of first impression under Hawaii law [9].

### A. *Liability of a Raw Material Supplier*

■ A manufacturer of a nondefective component part has no duty to analyze the design and assembly of the completed product of an unrelated manufacturer to determine if the component is made dangerous by the integration into the finished product. *Crossfield v. Quality Control Equip. Co.*, 1 F.3d 701, 704 (8th Cir.1993); *Childress v. Gresen Manufacturing Co.*, 690 F.Supp. 587, 591 (E.D.Mich.1988), *aff'd*, 888 F.2d 45 (6th Cir.1989); *Shaw v. General Motors Corp.*, 727 P.2d 387, 390–91 (Colo.App.1986); *Kellar v. Inductotherm Corp.*, 498 F.Supp. 172, 175 (E.D.Tenn.1978), *aff'd*, 633 F.2d 216 (6th Cir. 1980); *Lee v. Butcher Boy*, 169 Cal.App.3d 375, 215 Cal.Rptr. 195, 200 (1985); *Searls v. Doe*, 29 Ohio App.3d 309, 29 OBR 408, 505 N.E.2d 287, 289–90 (1986); *Davis v. Dresser Industries Inc.*, 800 S.W.2d 369, 370–71 (Tex. App.1990). The alleged foreseeability of the risk of the finished product is irrelevant to determining the liability of the component part manufacturer because imposing such a duty would force the supplier to retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems. *Childress*, 888 F.2d at 49.

A rule that places liability for a defective product on the finished product manufacturer and not the bulk supplier of inherently safe raw materials is not only supported by the weight of authority in other jurisdictions, but accords with common sense and the general principles underlying strict products liability law in Hawaii. Permitting plaintiffs to maintain a suit against the bulk supplier of inherently safe raw materials would lead to absurd consequences: there would be no end to potential liability if every manufacturer of nuts, bolts and screws could be held liable when their hardware was used in a defective product. *See* Restatement (Second) of Torts § 402A, Comment p (1965); *Kellar*, 498 F.Supp. at 175. In addition, a finished product manufacturer knows the specific end-use it intends to make of the material or component part and is in a far better position to

---

**7.** Duty is a question of law in Hawaii. *Cuba v. Fernandez*, 71 Haw. 627, 631, 801 P.2d 1208 (1990).

**8.** *In re Hawaii Federal Asbestos Cases*, 699 F.Supp. 233, 237 (D.Haw.1988), *aff'd* 960 F.2d 806 (9th Cir.1992).

**9.** Since this is a case of first impression in Hawaii, and since the court must apply substantive Hawaii law in this diversity action, the court must use its best judgment in predicting how the Hawaii Supreme Court would decide this issue. *See Takahashi v. Loomis Armored Car. Serv.*, 625 F.2d 314, 316 (9th Cir.1980).

evaluate its safety for that particular end use.

■ In Hawaii, a defendant is only liable under strict liability if a plaintiff can show that the defendant's product is dangerously defective. *Johnson v. Raybestos–Manhattan, Inc.,* 69 Haw. 287, 189, 740 P.2d 548 (1987). By definition, a plaintiff cannot show that a manufacturer of an inherently safe component part is producing a dangerously defective product. In addition, as a policy matter, Hawaii courts impose liability through the entire chain of distribution and manufacture under strict liability law because manufacturers and distributors can best allocate the cost of injuries which result from their defective products—they can insure against liability and then incorporate the insurance cost into the price of the product. *See In re Hawaii Federal Asbestos Cases,* 699 F.Supp. at 237–238. Yet, the cost to a manufacturer of an inherently safe raw material to insure against all conceivable misuse of his product would be prohibitively expensive. Accordingly, the court finds that if presented with the question of the liability of bulk supplier of inherently safe raw materials for the defective finished product of another manufacturer, the Hawaii Supreme Court would follow the above well reasoned precedent and decline to hold the raw material supplier liable.

■ In the present case, it is undisputed that Teflon is safe for multiple industrial uses and there is no evidence that Teflon is an inherently dangerous or unsafe raw material. Any danger resulted from the manufacture and particular use of the Implant as a final product which contained DuPont's raw material as a component part. Accordingly, as a component part manufacturer DuPont cannot be held liable for the use of its safe raw material in a defective end product.

The cases cited by plaintiffs are not to the contrary. The cases quoted at length in plaintiffs' memorandum deal with inherently dangerous or unsafe raw materials. Again, this is not the case here—the alleged danger arose only when DuPont materials were used in Vitek's Implant. In addition, while plaintiffs' allege a long standing "incestuous, mutually beneficial relationship" between Homsy and DuPont and claim that DuPont "knew that through Vitek the DuPont name would obtain recognition in the medical application field," [10] nowhere in the copious exhibits submitted by plaintiffs to this court is there any evidence of such a relationship. Absent such a relationship, DuPont cannot be required to supervise Vitek's use of Teflon in the Implant. Since PTFE is not inherently dangerous and since there was no special relationship between DuPont and Vitek, there is no legal basis for requiring DuPont to warn the ultimate consumers of the Implant. Accordingly, the court GRANTS defendant DuPont's motion for summary judgment.

### B. DuPont's Additional Arguments

Because the court grants DuPont's motion for summary judgment on the above grounds, the court declines to address DuPont's alternate arguments for summary judgment—the sophisticated purchaser doctrine, the effect of FDA regulation on the duty to warn, preemption and substantial change.

### C. Trademark Misuse

■ A substantial portion of plaintiffs' memorandum in opposition to defendant DuPont's motion for summary judgment is devoted to arguing that a trademark holder who permits a manufacturer to use his trademark is liable in tort for potential defects in the final product of the manufacturer. Specifically, plaintiffs argue that since Vitek improperly used DuPont's trademark, Teflon, and DuPont failed to prevent this improper use, DuPont is liable for the alleged defective nature of the Implant. The court rejects plaintiffs' argument for two reasons: (1) plaintiffs' have presented no evidence that Vitek improperly used DuPont's trademark; and (2) no case has ever held a trademark owner liable in tort for damages resulting from a defective product simply because the trademark owner did not properly police his trademark.

---

10. *See* Plaintiffs' Reply to Defendant DuPont's Reply to Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant DuPont's Motion for Summary Judgment at 3–4.

Vitek was legally entitled to use the Teflon trademark in order to state, accurately, that its implants contained Teflon plastic materials provided that this use did not deceive the public. *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). Plaintiffs argue that Vitek misused DuPont's Teflon trademark because "Vitek's use ... was not 'fair use' of mere 'descriptive information,' because such use could, and in fact did, create a likelihood of confusion as to the identity of the manufacturer of the Proplast/Teflon implant."[11] However, plaintiffs have presented no evidence that such confusion actually occurred or that anyone actually believed DuPont was the designer or manufacturer of the Implant. Moreover, in examining the exhibits presented by plaintiffs the court finds that no reasonable jury could hold that such confusion could take place as it was abundantly clear that Vitek and not DuPont was responsible for the manufacture and design of the Implant.

■ Even if plaintiffs could show that Vitek improperly used DuPont's trademark, such improper use, standing alone, could not impose liability on DuPont for plaintiffs' injuries. The court acknowledges that a trademark holder can be held vicariously liable when he "puts out as his own product a chattel manufactured by another." *See* Restatement (Second) of Torts § 400; *Carter v. Joseph Bancroft & Sons Co.,* 360 F.Supp. 1103, 1107 (E.D.Pa.1973); *Connelly v. Uniroyal Inc.,* 75 Ill.2d 393, 27 Ill.Dec. 343, 350–50, 389 N.E.2d 155, 162–62 (1979), *cert. denied* 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738. However, in all the cases cited by plaintiff the trademark owner had either voluntarily licensed its trademark or had significant involvement in the design, manufacture, or distribution of the other company's product. *See Burkert v. Petrol Plus of Naugatuck,* 216 Conn. 65, 579 A.2d 26, 35 (1990) (in order to hold trademark owner liable, the trademark owner must be significantly involved in the manufacturing, marketing or distribution of the defective productive product); *Hebel v. Sherman Equip.,* 92 Ill.2d 368, 65 Ill.Dec. 888, 442 N.E.2d 199 (1982). There is no authority for the proposition that the mere failure to adequately police a trademark subjected the trademark holder to tort liability and the court declines to so extend liability.

Plaintiffs have presented no evidence that DuPont ever put out the Implant as their own, nor that DuPont made any representations that they participated in the manufacture and design of the Implant. Plaintiffs have also not presented any evidence of the alleged "close collaboration" between Vitek and DuPont. Accordingly, the court does not find DuPont liable under this theory.

### D. *Warranty and Misrepresentation Claims*

#### 1. Warranty

Plaintiffs allege that Dupont expressly and impliedly warranted that the Implant was "safe" and "free from defects" and misrepresented that it was "harmless" (Second Amended Complaint ¶¶ 40, 45, 53). Dupont did not design, manufacture or sell the Implant and plaintiffs have presented no evidence that DuPont made any warranties or representations concerning the Implant.

■ There is also no evidence that DuPont made any express or implied warranties for PTFE's use in medicine. To support a claim for warranty of fitness for a particular purpose, plaintiffs must show that DuPont must have knowledge of Vitek's particular purpose and must also have reason to know that Vitek is relying on the seller to select or furnish suitable goods. *Ontai,* 66 Haw. at 250. There is no evidence that Vitek relied on DuPont's superior knowledge in selecting PTFE for the Implant. On the contrary, it is clear that Vitek employed its own medical judgment and independently selected PTFE for the Implant. In addition, DuPont specifically disclaimed any warranty when it sent Homsy a letter advising him that PTFE was not made for medical applications. Accordingly, as a matter of law, plaintiffs' warranty claims are without merit.

#### 2. Misrepresentation

Since plaintiffs have presented no evidence of misrepresentations by DuPont or reliance

---

11. Plaintiffs' Memorandum in Opposition at 31.

by plaintiffs, plaintiffs misrepresentation claims against DuPont are without merit. *See Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293 (Haw.1989).

## II. *Dow Corning's Motion for Summary Judgment*

Under Hawaii law, the rule of strict liability is as follows:

> One who sells or leases a defective product which is dangerous to the user or consumer ... is subject to liability for physical harm caused by the defective product to the ultimate user or consumer, ... if (a) the seller or lessor is engaged in the business of selling ... the product, and (b) the product is expected to, and does reach the user or consumer without substantial change in its condition after it is sold or leased.

*Jenkins v. Whittaker Corp.,* 785 F.2d 720, 731 (9th Cir.1986), *cert. denied* 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 296 (1986). Liability attaches to those responsible for placing the product in the "stream of commerce," and who are in the chain of distribution from the manufacturer to the ultimate user. *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982); *Exxon Shipping Co. v. Pacific Resources, Inc.,* 789 F.Supp. 1521 (D.Haw.1991).

Undisputed facts establish that Dow had a marketing agreement with Vitek to market certain Vitek products. This marketing agreement was initially executed in 1976 and terminated in March 1981. All the plaintiffs in this litigation received implants long after the termination of the marketing agreement between Dow and Vitek. Undisputed facts also establish that Dow did not participate in the design, manufacture, sale or distribution of the implants which are the subject of this litigation. Accordingly, plaintiffs have failed to meet their burden of proving that Dow placed the defective product in the stream of commerce. Plaintiffs acknowledge this lack of evidentiary support for any claims against Dow in their statement of no opposition to Dow's motion for summary judgment. Accordingly, the court GRANTS Dow's motion for summary judgment.

## CONCLUSION

For the reasons given, the court GRANTS DuPont's motion for summary judgment on all counts in plaintiffs' complaint and GRANTS Dow's motion for summary judgment on all counts in plaintiffs' complaint.

IT IS SO ORDERED.