**Robert O. JACKSON, Appellant,**

v.

**COLDSPRING TERRACE PROPERTY OWNERS ASSOCIATION, et al., Appellees.**

No. 14–95–00549–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 6, 1997.

Rehearing Overruled March 27, 1997.

Greg Thrower, Houston, for appellant.

William K. Luyties, John Abney Culberson, Houston, for appellees.

Before LEE, HUDSON and EDELMAN, JJ.

## OPINION

LEE, Justice.

Appellant, Robert O. Jackson, appeals two summary judgments granted in favor of appellees, KDI Corporation and KDI Aqua Systems, Inc. (collectively KDI). KDI initially obtained a summary judgment in 1991. The El Paso Court of Appeals determined the summary judgment was interlocutory because it did not address Jackson's "trademark cause of action." *Jackson v. Coldspring Terrace Property Owners Ass'n,* 838 S.W.2d 320, 321–22 (Tex.App.—El Paso 1992, no writ). The trial court refused to reconsider its original summary judgment and, eventually, granted a second summary judgment on the remaining claim. Jackson brings two points of error each attacking one of the summary judgments. We affirm.

This action stems from injuries sustained by Jackson in 1984 when he dove into a swimming pool owned by the Coldspring Terrace Property Owners Association (Coldspring pool). Jackson alleged that the pool was negligently designed and did not have sufficient depth markings. As a result, he was rendered a quadriplegic.

The Coldspring pool was constructed by Sam Gardner and his construction company (collectively Gardner)[1] in 1969. Gardner was the licensee or franchisee of Blue Haven Pools.[2] Under their agreement, Gardner was given the right to sell Blue Haven pools and equipment. Gardner was also to prominently display the Blue Haven name and logo on his marketing materials. Blue Haven provided Gardner with 1) equipment to build and maintain pools at a discounted rate; 2) advertisements in the local newspapers indicating that they had been in business since 1954 and sold more pools each year than any other builder; 3) "picture books," brochures and technical advice. In exchange, Blue Haven received a $100 royalty fee and a $50 payment on a note for each pool constructed.

Blue Haven did not participate in the actual construction of the pools. Rather, it allowed its name to be used in conjunction with the pools constructed by Gardner. Gardner testified by deposition that if a Houstonian were to look in the Yellow Pages, Blue Haven Pools was listed with several locations. Regardless of which number was called, a local licensee/builder would receive the call. The licensee/builder would work with the customer and attempt to sell a pool. All of

---

1. Gardner's construction company was known by various names, including Gardner–Blue Haven Pools, Inc., Gartro Enterprises, Inc., Coastal Concrete Pumping Co., Inc., Sam Gardner d/b/a Blue Haven Pools, and Gardner's Blue Haven Pools.

2. Blue Haven Pools changed its name to BHP before it was acquired by KDI. Throughout the opinion we have used Blue Haven Pools to refer to either BHP or Blue Haven Pools.

the documentation seen by the customer would bear the Blue Haven name and logo and the constructed pool would also bear the Blue Haven logo.

Jackson originally filed suit against numerous defendants alleging causes of action based on the strict liability theories of negligent design, manufacture and marketing, and breach of implied warranties. KDI was among those various defendants. KDI contests its exact status; however, Jackson alleged that KDI was a successor-in-interest to Blue Haven Pools. Thus, Jackson was attempting to hold KDI liable for Blue Haven's and Gardner's allegedly negligent design, construction and marketing of the Coldspring pool.

KDI answered Jackson's original petition with a general denial and asserted several affirmative defenses, including that Jackson's claims were barred by the statute of repose. In its initial motion for summary judgment and its various supplements, KDI asserted it had nothing to do with the design and construction of the Coldspring pool and that Jackson's claims were barred by the statute of repose.

While the summary judgment motion was pending, Jackson amended his petition adding a claim that KDI failed to "police its trademark." KDI's motion for summary judgment and subsequent supplements did not address this additional cause of action. The trial court granted a partial summary judgment on January 16, 1991, in favor of KDI. Jackson non-suited and/or took defaults against the remaining parties and appealed the summary judgment. On appeal, the matter was transferred to the El Paso court. The appeal was dismissed as interlocutory because Jackson's trademark claim was not addressed in the summary judgment.

After remand to the trial court, Jackson filed a motion to reconsider the original summary judgment, which the trial court denied. Eventually, KDI filed a second motion for summary judgment addressing Jackson's claim that KDI failed to police its trademark. The trial court granted the motion and Jackson appealed.

In two points of error, Jackson attacks the two summary judgments in favor of KDI. The standard of review to be followed in a summary judgment is well-established. The movant has the burden of showing there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. Every reasonable inference must be indulged in favor of the non-movant and any doubts are resolved in his favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984); *Karl v. Oaks Minor Emergency Clinic*, 826 S.W.2d 791, 794 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

Summary judgment for the defendant is proper when the proof shows that no genuine issue of material fact exists on one or more of the essential elements of the plaintiff's cause of action, or when the defendant establishes each element of an affirmative defense as a matter of law. *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 27 (Tex.1990). A defendant who moves for summary judgment has the burden of showing as a matter of law that no material issue of fact exists on the plaintiff's cause of action. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 166–67 (Tex.1987).

The function of a summary judgment is not to deprive a litigant of its right to a full hearing on the merits of any real issue of fact, but to eliminate patently unmeritorious claims and untenable defenses. *Dallas Cent. Appraisal Dist. v. G.T.E. Directories Corp.*, 905 S.W.2d 318, 319 (Tex.App.—Dallas 1995, writ denied). The purpose of the summary judgment rule is not to provide either a trial by deposition or a trial by affidavit, but to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that no genuine issue of material fact remains. *Id.* at 320.

In both motions for summary judgment, KDI urged that Jackson's causes of action were barred by the statute of repose. Initially, Jackson asserted that KDI was strictly

liable for his injuries under product liability theories as the successor-in-interest of Gardner's franchisor, Blue Haven Pools. While the initial summary judgment motion was pending, Jackson amended his petition alleging several instances where Blue Haven failed to "police its trademark."

Jackson admits that both of his claims are novel to Texas. He is unable to cite any Texas cases which directly support or apply their application. However, as noted in one treatise,

> There appears to be no Texas authority on the liability of licensors and franchisors when a licensee or franchisee sells a defective product. However, cases from other jurisdictions uniformly hold such parties liable.

2 J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS AND REMEDIES § 40.03[1][k] (1995).

There are two principal theories underlying Jackson's initial claim that a franchisor is strictly liable for defective products produced by their franchisee. *See Note, Theories Of Liability For Retail Franchisors: A Theme And Four Variations*, 39 Md. L.Rev. 264, 288 (1979). The first theory combines sections 400 and 402A of the restatement of torts.[3] The second theory, known as the stream of commerce theory, imposes liability based on the franchisor's control over the production of the franchisee's product and the consumer's decision to purchase it. *Id.* at 288–89.

In this case, from the consumer's perspective, it might have appeared that Blue Haven was the manufacturer of the pools. This is exactly the situation envisioned in section 400:

> The actor puts out a chattel as his own product in two types of cases. The first is where the actor appears to be the manufacturer of the chattel. The second is where the chattel appears to have been made particularly for the actor. In the first type of case the actor frequently causes the chattel to be used in reliance upon his care in making it; in the second, he frequently causes the chattel to be used in reliance upon a belief that he has required it to be made properly for him and that the actor's reputation is an assurance to the user of the quality of the product. On the other hand, where it is clear that the actor's only connection with the chattel is that of a distributor of it (for example, as a wholesale or retail seller), he does not put it out as his own product and the rule stated in this section is inapplicable. *Thus, one puts out a chattel as his own when he puts it out under his name or affixes to it his trade name or trademark. When such identification is referred to on the label as an indication of the quality or wholesomeness of the chattel, there is an added emphasis that the user can rely upon the reputation of the person so identified.*

RESTATEMENT (SECOND) OF TORTS § 400 cmt. d (1965). Thus, under Jackson's products liability theory, KDI would be liable as Blue Haven's successor-in-interest if Blue Haven "put out" the pools as its own.[4]

---

3. Section 400 provides:
 One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.
 Section 402A provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although

 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

4. Because it is not necessary for our disposition of this appeal, we do not express an opinion on whether Texas recognizes Jackson's product liability claim. However, it appears that restatement sections 400 and 402A are the law in Texas. *See Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 381 (Tex.1995) (stating "This Court has adopted the theory of strict products liability expressed in section 402A of the Restatement (Second) of Torts."); *Sears, Roebuck and Co. v. Black*, 708 S.W.2d 925, 928 (Tex.App.—Eastland 1986, no writ) (noting that one who puts out a product as

Jackson's second claim, Blue Haven's failure to "police its trademark," similarly relates to the consumer's perceptions of the product. Jackson argues that Blue Haven, as the trademark owner, was liable for Gardner's use of its trademark to deceive consumers. Jackson alleged that Blue Haven failed to maintain control over the quality of pools that Gardner built and marketed using the Blue Haven trademark. He also alleged that Blue Haven failed to exercise the authority it retained in the licensing agreement to inspect or oversee the design and construction of pools carrying the Blue Haven trademark.

The use of a trademark is generally controlled by the Lanham Act, 15 U.S.C. § 1051, et seq. *See* 1 JEROME GIBSON, TRADEMARKS PROTECTION AND PRACTICE § 1.01 (1996). However, as indicated by one author, few courts have addressed whether a consumer has a private cause of action against a franchisor:

> There is a paucity of legal authority on the question of whether a damaged member of the relevant purchasing public has a cause of action against a licensor or licensee or both for failure to control quality. There is nothing in the Act which expressly disallows such an action, and there is little question that the "related company" sections of the Lanham Act are designed to protect those members of the public from deception.... Adding such a private cause of action to more traditional grounds for relief, such as product liability and negligence generally, would provide an additional incentive to maintain quality. After all, there is no regulatory agency active on behalf of the public in this area.... And with the lax view many courts take of compliance with trademark quality control requirements, the risk of trademark abandonment may not be considered sufficiently critical to motivate licensors to discharge their legal duty to the public.

*Id.* § 6.01[6][g].

Two cases cited by KDI in support of its argument are instructive. KDI cites a Connecticut Supreme Court and a Hawaii federal district court case for the proposition that there is no private cause of action against a franchisor for failure to properly police a trademark. *See Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 579 A.2d 26 (1990); *Kealoha v. E.I. Du Pont de Nemours & Co.*, 844 F.Supp. 590 (D.Haw.1994).

In *Burkert*, the Connecticut Supreme Court started its opinion by stating:

> The principal issue in this appeal is whether the distributor of a defective product is entitled to indemnification against the licensor of a trademark under which the allegedly defective product was marketed, *when the trademark licensor did not participate in the production, marketing or distribution of the product.*

*Burkert*, 579 A.2d at 28 (emphasis added). A retailer sought indemnity from General Motors and a "rebrander" licensee. The trial court held that the "rebrander" was liable, but that GM was not and the retailer appealed only the finding in favor of GM. The Connecticut Supreme Court affirmed the trial court's judgment.

GM's involvement was "unusually limited." *Id.* GM operated a licensing program over its trademark Dextron II, automatic transmission fluid. GM would grant a license to a company if its product met twenty separate performance standards, but it did not control or even know the actual formulations of the product. Thus, the products sold containing the Dextron II trademark varied with the various producers who had licenses to the trademark. GM did not receive any royalties or other financial benefits from the licensing program; rather, it was attempting to ensure

its own, is liable as if it were the manufacturer); *see also Stanford v. Dairy Queen Products of Texas*, 623 S.W.2d 797, 805 (Tex.App.—Austin 1981, writ ref'd n.r.e.) (discussing section 400 in conjunction with determining proper venue under repealed venue provisions); *Maintenance and Equip. Contractors v. John Deere Co.*, 554 S.W.2d 28, 32 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ dism'd) (relying on section 400 in conjunction with determining proper venue under repealed venue provisions); EDGAR & SALES, *supra;* John C. Monica, *Franchisor Liability To Third Parties*, 49 Mo. L. REV. 309 (1984); *Theories Of Liability, supra;* Herbert B. Chermside, Jr., Annotation, *Vicarious Liability of Private Franchisor*, 81 A.L.R.3rd 764 (1977).

a sufficient supply of fluid for its automobiles.

Sun Oil had a license from GM to produce Dextron II. It sold fluid to a "rebrander" who sold, in quarts and in bulk, to a retailer. The rebrander substituted dyed base oil for the Dextron II fluid in several of the bulk shipments. It was these substituted shipments that resulted in damage to several automobiles. *Id.* 579 A.2d at 28–29. The Connecticut court held that GM was not liable under the Connecticut Product Liability Act, the Uniform Commercial Code, Connecticut Unfair Trade Practices Act or for breach of common-law warranty.

Nonetheless, the retailer argued that GM had an affirmative duty under the Lanham Act to police its licensees in the production, marketing and distribution of Dextron II. The court noted that the cases cited by the retailer dealt with whether a trademark owner had abandoned its right to a trademark. Thus, the court stated:

> None of *these cases* suggest, in any way, that a trademark owner's failure to exercise control subjects the owner to affirmative eligibility in tort for damages caused by a defective product bearing its trademark.

*Id.* 579 A.2d at 32 (emphasis added). The court then held that even if GM was negligent in failing to police its trademark, the evidence presented would not have given rise to indemnification because GM was not "in control of the situation" which was an essential condition of establishing indemnification in Connecticut. *Id.* 579 A.2d at 32–33. Thus, the court did not directly address the question presented here, whether a consumer can bring an action for injuries against a licensor or franchisor when it participated in the marketing of a defective product.

The second case relied on by KDI, *Kealoha,* similarly deals with a situation where the licensor did not participate in the manufacture and design of a product. The plaintiffs alleged that they were injured by a temporomandibular joint (TMJ) implant which contained Teflon, a product sold by DuPont to the manufacturer of the implant. DuPont did not participate in the design, manufacture or marketing of the implant. As KDI urges, the court did state:

> There is no authority for the proposition that the mere failure to adequately police a trademark subjected the trademark holder to tort liability.

*Kealoha,* 844 F.Supp. at 596. However, in coming to this conclusion, the court acknowledged that a trademark holder could be "vicariously liable when he puts out as his own product a chattel manufactured by another." *Id.* The court noted that in order to be held liable the licensor of the trademark had to be significantly involved in the design, manufacture, or distribution of the defective product. *Id.*

The standard announced in *Kealoha* appears to be the law in most states. That is, if there is a sufficient relationship between the licensor and the end product, the licensor may be held liable because the licensor "put out" the product as its own. *See* Holly Piehler Rockwell, Annotation, *Trademark Licensor's Liability for Injury or Death Allegedly Due to Defect in Licensed Product,* 90 A.L.R.4th 981, 997 (1991). In fact, in a diversity case applying Texas law, the Fifth Circuit has held a licensor liable for personal injuries that stemmed from a defective product containing its trademark. *See E.I. du Pont de Nemours & Co. v. McCain,* 414 F.2d 369 (5th Cir.1969) (holding licensor liable because it assumed an active role in producing the compound and retained the right to approve the product label and because trademark name was easily observed on the solvent can while licensee's name and product's name were blended into a beige background; also stating that based on the labeling a consumer could have reasonably believed that the product was under the licensor's control).

Both theories asserted by Jackson stem from the allegation that Blue Haven "put out" itself as the manufacturer of the Coldspring pool. In that regard, Jackson has stated a cause of action or actions which might be recognized in Texas. However, KDI moved for summary judgment arguing, among other things, that Jackson's claims were barred by the statute of repose.

■ Section 16.009 of the Civil Practice and Remedies Code, a statute of repose, provides that a suit against a person who constructs or repairs an improvement to real property must be brought not later than ten years after the improvement is constructed or repaired. See TEX. CIV. PRAC. & REM.CODE ANN. § 16.009 (Vernon 1986); *Sonnier v. Chisholm–Ryder Co.*, 909 S.W.2d 475, 478–79 (Tex.1995). Fifteen years elapsed between the construction of the Coldspring pool and Jackson's injuries. Seventeen years elapsed between the construction of the Coldspring pool and Jackson bringing this action. If the statute is applicable, it would bar Jackson's cause of action.

Jackson maintains the statute does not apply to KDI because it did not actually construct the pool. The supreme court has recently held that the statute only protects "those who actually alter the realty by constructing additions or annexing personalty to it." *Sonnier,* 909 S.W.2d at 482. However, *Sonnier,* dealt with two extremely different questions from the issues before us:

1. whether a manufacturer of personalty which becomes an improvement to real property "constructs" an "improvement to real property."

2. when personalty is installed and used on one piece of land for over ten years, and then is removed and reinstalled on another property by the initial purchaser, whether the ten-year repose period starts again upon the substantial completion of the personalty's reinstallation.

*Id.* at 478. The supreme court held that the statute of repose does not "protect those who do no more than manufacture personalty that is later transformed by third parties into an improvement." *Id.* In this case there is no question that Gardner was a manufacturer that constructed an improvement to real property. Therefore, Gardner would clearly fall within the statute's protection. The remaining question is whether KDI is also afforded the same defense.

Jackson maintains that KDI is *directly* liable as a franchisor, not vicariously liable for Gardner's actions. In support of this argument, he cites two law review articles, John C. Monica, *Franchisor Liability To Third Parties,* 49 Mo. L. REV. 309, 323 (1984), Note, *Theories Of Liability For Retail Franchisors: A Theme And Four Variations,* 39 Md. L.Rev. 264, 273 (1979). Neither article cites any authority in support of why a franchisor should be directly liable rather than vicariously liable under a strict liability theory.[5] The authors of these articles apparently believed that because the franchisor *could* control the activity of the franchisee through the franchise agreement or their relationship, the franchisor's activities could impose liability for defective products bearing their name. Thus, the franchisor would be directly responsible, at least in part, for the product defect. We are unpersuaded by this argument as applied to the facts of this case.

KDI presented summary judgment evidence that Blue Haven did not participate in the design or construction of the pools. Blue Haven provided only its name and marketing assistance to Gardner, but exercised *no* control over him or his business operations. Because Gardner was wholly responsible for *any* defects in design and construction of the pools, KDI and Blue Haven's liability, *if any,* would arise from the franchisor holding itself out as the manufacturer of the pool. Gardner was the actual manufacturer of the pool; therefore, any defenses available to him are available to KDI and Blue Haven. *See Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 345 (Tex.1992); *see also Dubin v. Carrier Corp.,* 731 S.W.2d 651, 654–55 (Tex.App.—Houston [1st Dist.] 1987, no writ) (holding that company that only distributed product fell within statute because of how it *functioned* in relation to the transaction).

In summary, we hold that KDI established as a matter of law that it was entitled to summary judgment under both Jackson's product liability claim and failure to "police its trademark" claim. Both of Jackson's

5. The Maryland note simply states, without discussion or authority, that a franchisor is directly liable. The Missouri article is subdivided into vicarious and direct liability. Products liability of a franchisor is discussed under the direct liability subdivision, but the reason for the subdivision is not explained.

claims are barred by the statute of repose because KDI's potential liability could only vicariously result from Blue Haven "putting out" itself as the manufacturer of a defective construction of the pool. Further, under Texas law, we have found no authority for a private right of action against a licensor for failure to police a trademark, and we decline to adopt such a remedy. The summary judgments were properly granted, and we affirm the judgment of the trial court.