[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 9030
In September, 1986, the defendant, Stamford Towers Limited Partnership (hereinafter "STLP"), engaged Edlar Inc. (hereinafter "Edlar") to develop a certain piece of real estate known as Stamford Towers in Stamford, Connecticut, consisting of two high-rise commercial buildings. The contract between STLP and Edlar is known as the Development Agreement. On May of 1987, Edlar contracted with the plaintiff Gilbane Building Company (hereinafter "Gilbane"), to construct the project. The contract between Edlar and Gilbane is known as the Construction Management Agreement, (hereinafter "CMA").
During the course of construction problems developed because Edlar had agreed in the Development Agreement to deliver the two buildings to STLP for a guaranteed maximum price; but in the CMA Edlar had agreed to pay Gilbane the actual costs of construction plus an $850,000 fee.
Edlar's dilemma worsened as the buildings neared completion. Disputes with both STLP and Gilbane. In an effort to complete construction despite these differences, the parties entered into a Recision and Escrow Agreement, under which the three parties resolved to continue the construction without prejudice to their respective legal positions.
A consolidated arbitration of the claims by STLP against Edlar and Edlar against Gilbane was ordered by the New York Supreme Court to take place in New York before a five member arbitration panel. Arbitration hearings commenced on or about September 12, 1989 and continued for the next three years. During the course of the arbitration, construction continued until completion of the project. After 93 evidentiary hearings, 10,000 pages of transcript and 2,700 pre-marked exhibits, the panel issued a single award on January 22, 1993. The panel found for Gilbane and STLP to recover damages from Edlar. Gilbane was awarded $1,906,444.00 against Edlar, $28,326.00 for stenographic services and $620,650.00 for the cost of its appointed arbitrators. STLP was awarded $7,743,185.00 on its claim against Edlar as well as its stenographic costs and appointed arbitrators costs. The panel additionally found that STLP properly terminated Edlar pursuant to the terms of the Development Agreement. Judgment in accordance with the arbitration award was entered on September 7, 1993. Neither Gilbane nor STLP recovered any of their awards from Edlar. Edlar proved to be insolvent and this CT Page 9031 lawsuit followed.
In the instant lawsuit, Gilbane seeks damages from STLP in six counts. The first count is a foreclosure of Gilbane's mechanic's lien; the second count is for breach of contract, specifically, STLP's breach of what has been referred to at trial as the "Recision and Escrow Agreement"; the third count is for unjust enrichment; the fourth count sounds in fraud; the fifth count claims damages under CUTPA; and the sixth count is for breach of the CMA specifically Article XVII therein.
STLP answered Gilbane's complaint denying it was indebted to Gilbane, plead numerous special defenses and counterclaims. Gilbane replied that it didn't owe any monies to STLP.
A third party plaintiff, Moliterno Stone Sales, Inc. (hereinafter Moliterno), a subcontractor of Gilbane seeks by way of a cross-claim to foreclose its own., mechanic's lien.
Moliterno for the contract sum of $1,555,303.00 agreed with Gilbane to perform the "granite work" on the project. This work included the placement of precast concrete "pavers" in specified portions of the plazas.
Moliterno being one of the last of several subcontractors to work on the plazas was owed $155,674.00. This sum represented only the unreleased 10% contractual retainage withheld by STLP.
All of Moliterno's periodic payment requisitions, as submitted through Gilbane, had been approved and paid. Nevertheless, because the Stamford Towers buildings began to leak into the garage below the upper plaza STLP refused to release Moliterno's retainage. Once again STLP denied any duty to release the retainage and claims damages from Moliterno for the costs to repay alleged defective works by Moliterno.
MOLITERNO'S LIEN
By stipulation, Stamford Towers and Moliterno have disposed of many of the potential issues concerning Moliterno's technical compliance with Connecticut's mechanic's lien law (Conn. Gen. Stat. § 49-33, et seq.). Specifically, Stamford Towers and Moliterno have agreed that:
(a) Moliterno performed services and/or furnished CT Page 9032 materials in connection with the Stamford Towers project at 680-750 Washington Boulevard, Stamford, commencing on August 1, 1988, pursuant to a written contract between Moliterno and Gilbane.
(b) Moliterno claims it is owed $155,674.00, plus interest, for services and materials provided pursuant to its contract with Gilbane.
(c) On December 31, 1990, Moliterno filed a Certificate of Mechanic's Lien (Tr. Ex. 52) on the Stamford Land Records, duly executed and sworn to.
(d) Within the time period described, Moliterno served Stamford Towers with a copy of the lien certificate and served Stamford Towers and Gilbane with written notice of its intent to claim a lien.
(e) Moliterno's foreclosure of its lien was brought within one year of the date the lien was filed.
(f) At the time of commencement of the foreclosure, Moliterno filed and served a notice of lis pendens.
Only two issues remain for the trial court. The first is, was the lien filed within "the requisite time period" as required under the statutes and if so, the second issue is to determine the amount of the debt.
THE REQUISITE TIME PERIOD
Conn. Gen. Stat. § 49-34 provides in pertinent part:
"A mechanic's lien is not valid unless the person performing the services or furnishing the materials (1) within ninety days after he has ceased to do so, lodges with the town clerk . . . a certificate in writing. . . ."
Moliterno's mechanic's lien was filed on December 31, 1990. Thus, for its lien to be valid, Moliterno would had to have performed services or furnished materials in connection with the Stamford Towers project on or after October 2, 1990 (the ninetieth day prior to the date of filing of the lien).
The evidence before the court established that Moliterno's CT Page 9033 forces were working on the job at the request of the owner's agent until at least the week ending November 21, 1990 (within the period of time), however, STLP claimed that that work was so trivial or inconsequential as compared to the work performed relative to the entire upper and lower "plazas", that it should not be found to extend the time for filing the lien.
While the court agrees with STLP that the work in question was trivial, nevertheless, the work performed was required under the general contract.
In Martin Tire Rubber Co. v. Kelly Tire Rubber Co.,9 Conn. 396, 122 A. 102 (1923), the owner asserted the then 60-day deadline as barring a lien because the only work performed within the 60-day period, and after "substantial completion," was one carpenter's labor for one day. The Supreme Court offered the following analysis:
 "The defendant misconceives the proper application of the rule of substantial completion in determining the time from which the sixty-day period should be computed. The period for filing the lien under our statute §§ 5217, 5128) `for material furnished or services rendered in the construction, raising, removal or repairs of any building,' will be computed, ordinarily, from the date of the last item of material furnished or services rendered. The rule is one to be applied fairly to both the lienor and the owner. If, after the work is substantially done, the claimant for the material furnished or services rendered shall unreasonably delay the completion of the work, the date of beginning of the sixty-days period will be taken as the date when the work was substantially done. No trivial or inconsequential service or work done after the substantial completion of the building will extend the time for claiming the lien, or revive an expired lien when an unreasonable period has elapsed since the substantial completion. If the article furnished or the service rendered be trivial, but be required by the terms of the contract of building, this fact will be taken into consideration in determining whether the elapsed period be unreasonable or not. And `where a service is performed or material furnished at the request of the owner, it will extend the time for claiming a lien or will revive an expired lien, as to a CT Page 9034 contract . . . substantially performed.' 35 L.R.A. (N.S.) 904 note. Thus in Nichols v. Culver, 51 Conn. 177, it is held that trivial work done or material furnished will be sufficient to extend the time of filing the lien if done at the request of the owner and not for the mere purpose of saving his lien."
Here, it cannot be found that Moliterno unreasonably delayed completion of its work. STLP however made such a claim, and the area in question was obviously the subject of discussion for some time before it was definitively determined to be part of Moliterno's contract. The project architect did not produce a layout drawing reflecting design revisions for the area in question until August 6, 1990, and the work was done at the express direction of the owner, communicated after "substantial completion" (Ex. 196, letter of July 9, 1990: "The owner wishes these pavers to be installed.") Given that the work was done at the owner's direction and within a reasonable time after it was determined to be Moliterno's responsibility there is no reason for the court to deviate from the usual rule that the filing period runs "from the date of the last item of material furnished or services rendered." Since the court finds that the work in question was done at the owner's request and within a reasonable period of time and that it was work required under the general contract, the court cannot find that the work was done "for the mere purpose of saving the lien." Mandelker v. Quality Stairs,Inc. 2 Conn. L. Rptr. 101. The court finds that the lien filed on December 31, 1990 was filed within "the requisite time period."
AMOUNT DUE ON THE LIEN
The court finds that unless STLP can prevail on its special defenses and or counterclaims the amount due on the lien is the amount of the retainage withheld by STLP, $155,674.00 without interest. The court finds that STLP was acting reasonably as to the issue of the leaks and other deficiencies that it was experiencing in the plaza areas. Therefore the court cannot find that STLP acted wrongfully in its detention of the retainage.
STLP's special defenses and counterclaims are as articulated hereinafter in the issues between Gilbane and STLP.
GILBANE'S CLAIM
In count one of Gilbane's complaint, Gilbane seeks to CT Page 9035 foreclose on its mechanic's lien in the amount of $2,650,017.65. There was no dispute between Gilbane and STLP as to Gilbane's entitlement to file a mechanic's lien under C.G.S. § 49-33. Moreover, there was no dispute that Gilbane complied with the statutory requirements for perfecting the lien under C.G.S. § 49-34. Gilbane worked continuously on the project from 1987 to 1992 including closeout of the trade contract, punchlist and warranty works. STLP claims that since it had paid Edlar all sums due to Edlar, the lien is to be discharged. This is the "Lien Fund Defense."
In determining the amount to which any lien or liens may attach upon any land or building, the owner of the land or building "shall be allowed whatever payments he has made, in good faith, to the original contractor or contractors, before receiving notice of the lien or liens. Conn. Gen. Stat. § 49-36
(c)."
The Connecticut Supreme Court held that "in determining the amount to which any lien or liens shall attach upon any land or building, the proprietor of any such land or building shall be allowed whatever payments he shall have made in good faith to the original contractor before receiving notice of such lien or liens." Gridley v. Sumner, 43 Conn. 14, 15 (1875). Since 1875, the Connecticut Supreme Court has been consistent: the amount of any mechanic's lien filed by a subcontractor "may be diminished . . . by `bona fide payments, as defined in section 49-36, made by the owner before receiving notice of [the mechanic's] lien or liens.'" Rene Dry Wall Co. v. Strawberry HillAssocs., 182 Conn. 568, 572, 438 A.2d 774 (1980). Connecticut's mechanic's lien statutes limit "the totality of mechanic's liens to the unpaid contract debt owed by the owner. . . ." Seaman v.Climate Control Corp., 181 Conn. 592, 602, 436 A.2d 271 (1980).
The net result is that if the owner makes payments which are not forwarded to the subcontractors, the owner making such payments "is protected as long as the owner acts in good faith and reasonably as defined by the statutes." Rene Dry Wall,182 Conn. at 573; see also, Biller v. Harris, 147 Conn. 351, 354,161 A.2d 187 (1960); "If there is no balance due the contractor, under ordinary circumstances there would be nothing to which the liens or subcontractors could attach." Hubbell, Hall RandallCo. v. Pentecost, 89 Conn. 262, 264, 93 A. 672 (1915). If the contractor is "entitled to no lien . . . the subcontractors are not entitled to any." Kelly v. Alling, 84 Conn. 487, 491, 80A. CT Page 9036 782 (1911).
STLP claims that since Edlar is not due any money it has no right to a mechanic's lien, likewise Gilbane and all its subcontractors, have no right to a mechanic's lien. This claim raises the question as to who is the "contractor" for lien purposes in this case — Edlar or Gilbane? While Edlar and STLP agreed on a guaranteed maximum price, Gilbane had no part in that process and did not guarantee any maximum price to either Edlar or STLP. That fact was known to STLP when it approved the CMA and was evident when it executed the Recision Agreement.
In Nickel Nine Brook Associates v. Joseph E. Sokol, P.C.,217 Conn. 361, 368 (1991 ) the Connecticut Supreme Court stated that "a mechanic" is normally envisioned as a skilled worker who brings about a result by the use of tools, machines or equipment. Under the terms of the Development Agreement which sets forth the responsibilities of Edlar on the project, Edlar provided no actual labor or materials in the construction of the Stamford Towers. Since Edlar was not a "mechanic" in this project, the court finds Gilbane to be the "original contractor". Under the statutes the Connecticut Supreme Court has interpreted the term original contractor as one "whose contract of employment imposes a direct obligation upon the property owner resulting from the latter's participation therein either personally or through an authorized intermediary Soule v. Borelli, 80 Conn. 392, 398. Gilbane's lien rights are therefore independent of and unaffected by STLP claims against Edlar. Gilbane's lien rights cannot be found by the court to be surrogated to those of Edlar or any other party.
During the trial STLP introduced testimony as to the total amount of monies STLP paid Edlar, however, that testimony did not convince the court that those sums were paid in "good faith". Trial exhibits reflect payments after having notice of Gilbane's mechanic's lien dated February 1, 1989. STLP had to show that each and every payment it made subsequent to February 1, 1989 were made in good faith in order to reduce the "fund". The court finds that STLP failed in its burden of proof in reducing the "lien fund" to zero dollars. Under paragraph 1 of the Recision Agreement STLP assumed a direct obligation to Gilbane in the amount of $617,048.00 and in fact had escrowed that sum in a restricted fund. To say that that sum was paid to others in "good faith" is not reasonable. No "lien fund defense" can exist to at least to that sum. CT Page 9037
BREACH OF THE RECISION AGREEMENT
In count two Gilbane seeks damages from STLP resulting from its breach of the Recision Agreement. The May 18, 1989 letter agreement between Gilbane, Edlar and STLP commonly known as the "Recision Agreement" obligated STLP to Gilbane separately and distinctly from STLP's obligation under the Development Agreement. In paragraph 1, Gilbane's unpaid fee ($617,048.00) would be placed in escrow "no money shall be paid to Gilbane from that escrow fund until . . . a negotiated settlement . . . or the fee due from Edlar had been determined by arbitration. STLP would place the disputed fee in escrow for up to 18 months unless extended by agreement of all parties which was done. However the escrow agreement eventually lapsed and the funds were returned to STLP. In paragraph 5, STLP would continue to fund the construction "without prejudice to the rights of any party to claim . . . that the party receiving the payment was not entitled to such payment or that one of the other parties is ultimately liable for the amount of such payment".
After the Recision Agreement was signed, Gilbane continued to provide its services to the project thereby incurring additional costs. Before the arbitration awarded to Gilbane against Edlar was made, the escrow agreement had lapsed. After the arbitration award, Gilbane requested its fee from STLP. STLP then claimed to have suffered damages from Gilbane's defective construction of the plaza areas and from problems with the precast panels. Accordingly, STLP refused to pay Gilbane its fee. The court finds this to be a breach of paragraph I of the Recision Agreement and finds that unless STLP defenses and or counterclaims are found to be proven Gilbane is entitled to the escrowed amount $617,048.00 plus the unpaid balance which occurred during the last phase of construction in the amount of $153,022.00 which combined with fees already paid equal Gilbane's entire fee of $850,000, without interest. While the court finds that STLP is obligated for Gilbane's fee, however the court finds that STLP, because of the construction problem in the plaza area and the alleged problems with the precast panels, acted reasonably and cannot therefore find that STLP's failure to pay was wrongful or unreasonable. The court agrees that the escrow agreement itself had termination by a lapse of time. However, the first paragraph of the Recision Agreement must be enforced.
GILBANE'S THIRD COUNT UNJUST ENRICHMENT
CT Page 9038
Gilbane alleges that as the owner of the buildings. STLP has been unjustly enriched by the "services, labor and materials furnished" to the project by Gilbane. To recover under unjust enrichment, Gilbane must have demonstrated: (1) that STLP had benefited from the transaction or received something of value, and (2) that the benefit was unjust, that is, that it was not paid for by STLP. See Garwood Sons Construction Co. v. CentosAssoc. Ltd. Partnership, 8 Conn. App. 185; also see Brady v. Cityof Stamford, 220 Conn. 432. While the court agrees that STLP had benefited from the transaction or received something of value, the court cannot find that the benefit was unjust. Clearly, STLP could not be found to have been "unjustly enriched" when it had to pay $64,800,000 against a guaranteed maximum price of $59,400,000 and where Gilbane received a judgment of $7,443,185 against Edlar.
PARAGRAPH 5 OF THE RECISION AGREEMENT
Gilbane argues that paragraph 5 of the Recision Agreement makes STLP additionally liable for the construction costs in the rest of the arbitration award.
"5. Notwithstanding the claims asserted in the above-entitled arbitration or otherwise, Stamford Towers agrees to pay all approved requests for payment, which approval shall not be unreasonably withheld and submitted to Edlar, Inc., based on construction costs incurred by Gilbane and/or its subcontractors until Base Building Completion, which is expected to occur on approximately September 1, 1989, is achieved. Approved payments shall also include requests which have been earlier disapproved, either in whole or in part, but subsequently approved either through negotiations or arbitration between Gilbane and Edlar, Inc. Should Edlar refuse to approve any request for payment submitted by Gilbane, Gilbane, on five days prior to written notice to Edlar, may submit the request for payment to Stamford Towers which, in its sole discretion, may make payment of any amount due directly to Gilbane. All payments contemplated by this paragraph shall be made without prejudice to the rights of any party to claim in an arbitration that the party receiving the payment was not entitled to such payment or that one of the other parties is ultimately liable for the amount of such payment. Moreover, from and after the date hereof, Edlar's approval of proposed change orders submitted by Gilbane and its (Edlar's) submission of additional change orders to Stamford as a CT Page 9039 consequence thereof shall be without prejudice to Edlar's and Stamford's rights to assert that they are ultimately not liable for the amount of such change orders or the delay attendant upon the work contemplated by the change orders or to assert that Gilbane or Edlar is not entitled to any additional sums as reflected in such change orders."
Although paragraph 5 was clearly intended to keep the project funded and progressing, the court does not find it to be a guaranty. Paragraph 5 consists of a mix of compromises under which all the parties reserved their rights. As stated in Exhibit 42 — Gilbane stated "we would be amenable to negotiating a total close out of our contractual clause" (under paragraph 5). Although STLP agreed to make interim payments to fund construction, these payments were "without prejudice". The court finds that STLP never intended to relinquish its primary defense, that is it was not liable for construction costs, in excess of the guaranteed maximum price of $59,400,000. (STLP actually paid $64,000,000). Edlar and not Gilbane originally proposed paragraph 5. During the negotiation no party described it as a guaranty and during the arbitration proceedings Gilbane never made such a claim. It was in that forum that any of those amounts allegedly owed to Gilbane by STLP should have been decided. Not only did the Recision Agreement provide that the payments were "without prejudice", but in the Escrow Agreement the parties provided in effect that "nothing contained in this Agreement shall be deemed to affect any pending or future disputes between Gilbane and STLP.
As to Beer Precast claim and B.T. Equipment claims and interest costs they have not been proven to the satisfaction of the court. of course arbitration costs, are found not to be valid construction claims. Moliterno claim has already been determined.
GILBANE COUNT FOUR (FRAUD) AND COUNT FIVE (CUTPA)
"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed". Billington v. Billington,220 Conn. 212. In order for Gilbane to prove fraud the following elements must have been proven by clear, precise and unequivocal evidence to wit:
"First, that the defendant made to him a representation of fact, or a promise with a present intention not to keep it or an CT Page 9040 assurance that something would happen in the future, when he knew or had reason to know that it would not happen or without any belief that it would come about or in disregard as to whether it would or would not; second, that any representation or representations of fact made by the defendant were untrue and known by the defendant to be untrue or were made without any belief in their truth or falsity or in disregard of their truth or falsity, third; that the defendant made the representation or representations with the intent to induce the plaintiff to enter into the transaction; fourth; that the representation or representations were a material element in inducing the plaintiff to take that action, and, finally; that they did actually induce the plaintiff to enter into the transaction or enter it upon the terms which he did. If, however, the plaintiff has failed so to prove any one of these elements, he cannot recover."
After reviewing the trial exhibits, the court notes as to the testimony, and the briefs as submitted, the court cannot find sufficient evidence to make a positive finding that all four elements were proved by the standard required. The court finds that what we have here is the normal building contract disputes and does not believe that any parties to this lawsuit acted in bad faith or intentionally misrepresented their intent as to what they intended to happen in the future.
As to CUTPA the following criteria is used to determine whether an action or a practice is deceptive or otherwise violates CUTPA. Connecticut courts have adopted the F.T.C. "cigarette" rule which has the following three prongs:
"(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise, whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (competitors or other businessmen). A.G. Goods, Inc. v.Pepperidge Farms, Inc., 216 Conn. 200, 215 (1990) quoting Conawayv. Prestia, 191 Conn. 484, 492-493 (1983).
The practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Hesslin v. Connecticut Law Clinic of Trantolo Trantolo, 190 Conn. 510 (1983). For an act to be `deceptive' CT Page 9041 under the CUTPA statute the action must have a tendency or capacity to deceive the plaintiff. McLaughlin Ford, Inc. v. FordMotor Co., 192 Conn. 558, 569 (1984). Moreover, a simple breach of contract is not sufficient to establish a violation of CUTPA, particularly where the CUTPA allegations are simply incorporated by reference from the breach of contract claims and do not set forth how or in what respect such activities are either immoral, unethical, unscrupulous or offensive to public policy. BoulevardAssociates v. Sovereign Hotels, Inc., 72 F.3d 1029. 1039 (2d Cir. 1995). Here, Gilbane has neither alleged specific facts nor presented any evidence whatsoever which supposedly demonstrated the "immoral, unethical, etc. nature of STLP actions. The court finds that the failure to pay Gilbane as requested was not unscrupulous and unethical. As stated before by the court, the court finds that all parties were acting in "good faith" under trying circumstances.
GILBANE'S SIXTH COUNT: ARTICLE XVII OF THE CMA
Under the terms of Article XVII of the CMA, STLP assented upon the termination of Edlar, to assume payment obligations to Gilbane. Gilbane claims that STLP terminated Edlar and assumed all of its obligations under the CMA. While it is true that STLP attempted to terminate Edlar in September of 1989, Edlar exercised its rights under Section 2.02(b) (Development Agreement) and submitted the issue of the propriety of that termination in the pending arbitration. Edlar remained on site and continued to act as the developer. Although STLP tried to terminate Edlar nothing changed on the job site. Gilbane continued to interact with Edlar exactly, as it had right from the time the project started and never during that period of time claimed that STLP had assumed Edlar's position under the CMA.
In 1993 the arbitrators ruled that STLP was entitled to terminate Edlar and had properly done so. But by this time the issue was academic. Construction was now completed. The court finds that STLP never actually assumed the rights or obligations of the CMA. The termination of Edlar and the assumption of the CMA never in fact I legally occurred.
STLP SPECIAL DEFENSES RES JUDICATA AND COLLATERAL ESTOPPEL
STLP argues that Gilbane's complaint is barred by the doctrine of res judicata. CT Page 9042
As stated in Finks v. Golenbock 238 Conn. 183 at 191
"[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action [between the same parties or those in privity with them] on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose. The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it.
We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. [T]he claim [that is] extinguished [by the judgment in the first action] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a "transaction," and what groupings constitute a "series," are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."
In applying the transactional test, "we compare the complaint in the second action with the pleadings and the judgment in the earlier action."
A judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Parklane Hosiery Co. v. Shore, 439 U.S. 322,326, 58 L.Ed.2d 552, 99 S.Ct. 645 (1979); Murphy v. Gallagher,761 F.2d 878, 879 (2d. Cir. 1985). "The parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." In re Teltronics Services,762 F.2d 185, 190 (2d Cir. 1985). The proponent of res judicata must demonstrate that: (1) the court rendered a final judgment on the merits in the prior case; (2) the prior suit involved the same parties or their privies; and (3) the opponent bases the CT Page 9043 subsequent suit on the same causes of action. See NLRB v. UnitedTechnologies Corp., 706 F.2d 1254, 1259 (2d Cir. 1983).
The doctrines of res judicata and collateral estoppel apply to an arbitral decision. See James L. Shapier Agency, Inc. v.Green, 190 F. Sup. 713, 719 (S.D.N.Y.), aff. 239 F.2d 769 (2d Cir. 1961). Accordingly, a court will give an arbitration decision preclusive effect where the traditional prerequisites for preclusion are met.
As to collateral estoppel, it prevents the relitigation of an issue that was raised, litigated, and decided in a prior proceeding. Unlike res judicata, however, collateral estoppel precludes the relitigation of conclusively determined issues even if the plaintiff bases the subsequent suit on a different cause of action. G T Terminal Packaging, 719 F. Supp. at 159.
For collateral estoppel to apply, a party must show (1) that the issue was not only litigated but also was necessary to the outcome of the prior action; and (2) that the litigant had a full and fair opportunity to litigate its case. Jim Bean Brands Co. v.Beamish Crawford Ltd., 937 F.2d 729, 734 (2d Cir. 1991). Although no one factor is dispositive, a court considers: (1) whether the same transaction is at issue; (2) whether the same evidence is needed to support both claims; and (3) whether the facts essential to the second action were present in the first.
The court finds that these defenses by STLP are not effectual in this instant lawsuit. The issues being asserted in the lawsuit are different from the causes of action which Gilbane asserted against Edlar in the arbitration proceeding. The claims being made in this lawsuit were not "actually made" or could have been made in the consolidated arbitration proceedings. Also not all of the instant claims could have been made in the arbitration proceedings. The court finds that the two arbitration clauses contained in the Development Agreement and the CMA constituted separate and distinct agreements to arbitrate between Edlar and STLP and Edlar and Gilbane. Nowhere is there any provision providing for consolidated arbitration by court or for the arbitrator of any claim between STLP and Gilbane. The scope of an arbitration clause which constitutes a submission to the arbitrators cannot be altered except by the express mutual consent of the parties. A. Sangivanni Son v. F.M. Floryan,158 Conn. 467, 471. CT Page 9044
It is a fundamental principle that "Arbitration is a creature of contract and without a contractual agreement to arbitrate there can be no arbitration." Wesleyan University v.Rissil Construction Associates, Inc., 1 Conn. App. 351, 354-355
(1984)
 Arbitration agreements are to be strictly construed and such agreements should not be extended by implication . . . accordingly, the basis for arbitration in a particular case is to be found in the written agreement between the parties . . . persons thus cannot compel arbitration of a disagreement between or among parties who have not contracted to arbitrate that disagreement between or among themselves.
Id. Thus, the arbitration agreement is the sole source of the scope of any duty to arbitrate any claim. Stated differently:
 We have consistently held that the duty to arbitrate and the scope of that duty depend upon the terms of agreement between the parties to the contract . . . a party that has agreed to arbitrate certain matters cannot, for that reason alone, be compelled to arbitrate other matters that it has not agreed to submit to arbitration.
 W.J. Megin Inc. v. State, 181 Conn. 47, 51 (1980).
Applying these fundamental principles to this matter, because Gilbane never agreed with STLP to submit any claims which those parties may have had against each other to arbitration, Gilbane could not have voluntarily asserted any such claims against STLP in the consolidated arbitration proceeding, nor could Gilbane have been compelled to assert any such claims in those proceedings. The mere fact that the arbitration of claims between Edlar and Gilbane was consolidated with the arbitration of claims between STLP and Edlar does not alter this basic fact.
Gilbane did not voluntarily submit to the consolidated proceedings, and in fact objected to them. The consolidation was ordered by the New York Supreme Court. Under Connecticut law, no such consolidation could have been compelled. W.J. Megin Inc.,181 Conn. at 51-52. The mere fact that the two arbitrations were tried together to the same panel of arbitrators has absolutely no
effect on the ability of parties, such as STLP and Gilbane, who did not have any arbitration agreement between themselves, to assert claims against each other in the consolidated proceedings. CT Page 9045
As stated, Gilbane's claims against STLP could not have been raised in the consolidated arbitration. Neither the submission to the arbitrator made in conjunction with the STLP/Edlar disputes, nor the submission made in conjunction with the Edlar/Gilbane disputes encompassed/nor could it have encompassed the claims Gilbane now asserts against STLP in this lawsuit.
In January 1989, STLP and Edlar submitted to arbitration the propriety of STLP's termination of Edlar and the propriety of certain budgetary items, including responsibility for project cost, the inclusion or exclusion of change orders and time extensions, all under the terms of the Development Agreement. Edlar and Gilbane, on the other hand, submitted a different set of issues to the arbitrators, based specifically on the CMA, including Gilbane's entitlement to fee and construction costs as defined by Article VIII of the CMA.
Gilbane's claims against STLP arise out of different circumstances that did not even exist at the time of or, for that matter, during the course of the arbitration. Under Article XVII, STLP agreed to assume Edlar's contractual obligations to Gilbane upon STLP's termination of Edlar. Not until the arbitrators determined the propriety of STLP's termination of Edlar, could Gilbane even assert its Article XVII claim. Gilbane's Article XVII claim was not even "ripe" until after the arbitration. Likewise, STLP could not have breached the Recision Agreement and its attendant Escrow Agreement until either of two events occurred; Edlar and Gilbane settled their differences or the arbitrators determined what was "approved" costs. When the arbitrators rendered their decision in January 1993, Gilbane then made its demand on STLP under the Recision Agreement. STLP, through its counsel, chose to not make payment. Similarly, the exclusive jurisdiction to determine the ownership rights in real property affected by Gilbane's Mechanics Lien rests with the Superior Court. C.G.S. § 49-33 et seq. Even if the parties had wanted to, they could not have arbitrated the issue of the validity of Gilbane's Mechanics Lien, as arbitrators are not empowered to transfer title to property. Tsombikos v. Brager, r559 N.Y.S.2d 460 (Sup.Ct. 1990).
It is additionally, noteworthy that the instant action was commenced in August of 1991, to protect Gilbane's Mechanics Lien rights, nearly one and a half years before the arbitration panel rendered its award in the consolidated proceedings. If STLP ever CT Page 9046 believed, as it now asserts that Gilbane's claims against it were arbitrable, it could have filed a motion to stay these proceedings pending arbitration as soon as they were instituted. The fact that it did not do so indicates that STLP never believed Gilbane's claims could have or should have been asserted in the arbitration proceedings.
The court finds that STLP failed to proved its defenses of res judicata or collateral estoppel.
STLP AFFIRMATIVE CLAIMS FIRST. SECOND AND THIRD COUNTERCLAIMS
STLP claims that under the "Subordinate Agreement" with People's Bank, Gilbane promised to discharge all mechanic's lien then, or in the future, filed on the project in order to enable STLP to obtain a loan from the bank to fund tenant fit up. STLP argued that Gilbane wrongfully refused to discharge Moliterno's lien and its own mechanic's lien filed on February 1, 1991. The Moliterno's lien was placed on file only after STLP refused to release payments to Moliterno, even after numerous and extensive direct negotiations between them which extended over several months. Gilbane lien was filed to protect its claim for its $850,000 fee. Since STLP failed to make the required payments, the court cannot find that Gilbane breached its obligation under the "Subordinate Agreement" at least to STLP. STLP was caused no harm and is not entitled to an award of damages. As to the third count, "slander of Title", STLP failed to show that Gilbane made an "utterance of false charges or misrepresentations which defame and damage reputation" Battistelli v. Corso, 30 Conn. Sup. 135,143, or demonstrated malice on the part of Gilbane, WildwoodAssociates Ltd. v. Esposito, 211 Conn. 36. Without any proof on these claims, STLP claims must fail.
STLP CLAIMS FOURTH AND FIFTH COUNTS.
The fourth and fifth counts allege that Gilbane breached the Recision Agreement by not diligently performing its work, however, the court finds that those counts were not proven at trial. As to its fifth count, Violation of CUTPA, by Gilbane, as the court has already found no unfair method of completion and unfair or deceptive acts or practices in the parties' conduct, STLP's fifth count must also fail.
STLP'S COUNTERCLAIMS, SET OFFS AND RECOUPMENTS COUNTS 6 THROUGH 12
CT Page 9047
STLP's sixth count sounds of negligence; the seventh alleges a breach of implied warranty of merchantability; the eight count alleges a breach of express warranties; the ninth count alleges a breach of the CMA, the tenth count alleges products liability; the eleventh count alleges an "intended beneficiary" theory and the twelfth count alleges a CUTPA violation. These counterclaims basically arise from defects in the materials and construction of the plaza areas and the precast panel walls.
As to STLP's counts seven and eight, the court finds that the panels were not goods within the meaning of Article II of the Uniform Commercial Code. Under Connecticut law, construction contracts are not legally governed by the provisions of Article II of the Uniform Commercial Code. Cacace v. Morealdi,37 Conn. Sup. 735 and Gulash v. Stylarama, 33 Conn. Sup. 108. With regard to count ten which alleges a violation of C.G.S. §52-572M, the Connecticut Products Liability Act (CPLA), the CPLA provides the exclusive remedy for claims falling within its scope. Elliot v. Sears, Roebuck Co., 229 Conn. 500. A "product liability clause" is defined by the CPLA. However, liability under Connecticut's Product Liability Law is limited to only those individuals or entities who perform the activities set forth in § 52-572M(B) and defined as being a "product seller"Regal Steel Inc. v. Farmington Ready Mix, Inc., 36 Conn. Sup. 137. Whether a defendant is a "product seller" under CPLA is a question of law for the court's determination Burkett v. PetrolPlus of Naugatuck, 216 Conn. 65. Under the facts in this case, the court finds that Gilbane was not a "product seller". No Connecticut Supreme or Appellate Court case has applied the doctrine of products liability to the construction of buildings or other transactions regarding real estate. This court finds that the Stamford Towers buildings are not a "product" when C.G.S. § 42-572m et seq. and Restatement Second of Torts §§ 402A are read in conjunction with the policies underlying the act. As to the sixth count negligence, that count will be dealt with in general under the discussion as to plazas' defects and Precast Panel Defects. As to the twelfth count, as stated the court finds no CUTPA violations. As to count nine (Breach of CMA) and the eleventh count, intended beneficiary theory under CMA, the court finds that STLP fail in its burden of proof that the alleged negligent performance by Gilbane of its duties under Article I and Article II were proven.
Under Article I of the CMA, Gilbane covenanted, CT Page 9048
 "to furnish [Gilbane's] best skill and judgment and to . . . furnish efficient business administration and superintendence . . ." in connection with the project.
Gilbane further agreed to:
 [s]upervise and direct construction of the work in accordance with the plans and specifications of the Project;
 [p]rovide all supervision . . . necessary for the completion of the Project;
 [i]nspect and enforce correction of the work of trade contractors for defects and deficiencies;
 [t]horoughly review shop drawings for compliance with the Plans and Specifications; [and]
 [w]arrant that all materials and equipment included in the Project will be new, . . . and . . . will be of good quality, free from improper workmanship and defective materials and in conformance with the Plans and Specifications and approved shop drawings.
CMA Article II ¶¶ 2.2.1, 2.2.2, 2.2.8, 2.2.10.2, 2.2.15.
The evidence offered during the trial did not establish that Gilbane failed to perform according with those requirements.
PLAZAS' PROBLEMS
There are upper and lower plaza areas at each building. The upper plazas sit above basement utility rooms and the parking garages; the lower plazas sit on grade. As initially constructed, the upper plazas consisted of five layers; the concrete slab covered by the waterproof membrane, then the protection board, then the bituminous (or "asphaltic") setting bed and, finally, the pavers. Due to the fact that "nominal" pavers were actually used, the pavers were mortar jointed together (1/2 in joints) of butt jointed, as was originally specified.
STLP claims that the problem with the upper plazas started with the concrete slab itself regarding the pitch and elevation and also in defects in the drains. STLP also claims that the waterproof membrane was defective. STLP claims that Gilbane CT Page 9049 subjected the membrane to excessive wear and damage and that Gilbane allowed the membrane to be installed in a shoddy manner. The membrane had to be prepared on at least 11 separate occasions. STLP claims also that the flashing was missing, that handrail cores were drilled through the membrane without flashing, that no flashing had been installed around the drains and that serious problems existed with the fountains located in the plazas areas. STLP also claims that the leaking was aggravated by the method of installation of the plaza pavers. That the "nominal" (smaller) pavers had to have 1/2 in mortar joints instead of butt joints to maintain the 5 feet module design. The 1/2 inch. mortar joints rapidly deteriorated and failed.
From the testimony during the trial and from the exhibits the court finds that Gilbane failed to fulfill its obligations regarding the plaza work. However, the court finds that Hok's, the owner's architect, design of the plaza was also deficient. That when STLP could not resolve the leakage problem, it requested of Hok, its architect, to redesign a very much superior plaza design in the management of water and to resist leaks, for an alleged cost of $458,095. STLP claims that that cost should have to be paid by Gilbane. Gilbane claims that STLP plaza claims seeks money for a redesigned, rebuilt betterment, not monies for repairs. The court agrees. If STLP had incurred costs only for repairs of the plaza defects, the court would have found in STLP favor upon the necessary proof being offered, however, from the evidence during the trial, STLP introduced no evidence purporting to establish what the cost of restoring the defective plaza to its originally designed state would have been.
The court finds that the plaza which is in existence today as redesigned and rebuilt is very different from and superior to the plaza as originally designed and built. It is a clear betterment and enhancement. The redesigned and rebuilt plaza utilized two layers of waterproofing membrane rather than one as per the original design and installation; it eliminated the bituminous setting bed for pavers, and replaced it with a system in which the pavers were supported on pedestals, it increased the drainage capacity of the drains which were located at the membrane level; and it carried at ten year warranty. The cost of the "enhancement" which was built by STLP is not recoverable against Gilbane. The court finds that STLP failed on its burden of proof as to damages arising out of the plaza problems. CT Page 9050
THE PANEL PROBLEMS (EXTERIOR CURTAIN WALL OF THE BUILDING)
STLP claims that Gilbane is responsible for the defective design and erection of the precast panels which caused them to settle, crack and leak. STLP asserts a claim for $1,000,000 allegedly representing the cost of remediating the alleged settlement of the precast panels. Gilbane as part of its overall contract for the construction of Stamford Towers, engaged Beer Precast to manufacture and install the cladding system for these structures which was precast concrete panels approximately 8' high, 30' long and 8" thick. The panel dimensions had been specified by Hok, the owner's architect. Hok also specified the location of the intermediate support of the panels. Trial testimony and documentary evidence show that the panels were manufactured in accordance with the plans and specifications as well as to industry standards, and were approved by Hok prior to installation.
Under Connecticut law a contractor is not held responsible for loss or damage resulting from defective plans or specifications. Southern New England Contracting Co. v. State ofConnecticut, 165 Conn. 644, 655 (1974); see also, United Statesv. Spearin, 248 U.S. 132 (1918). In fact, it is the owner, and not the contractor, that impliedly warrants the adequacy and sufficiency of the plans and specifications. J.D. HedinConstruction Co. v. United States, 347 F.2d 235 (1965). A contractor satisfies its contractual duties where it performs its contract work in accordance with the plans and specifications, even though the method or performance required under such plans and specifications does not produce a defect-free product. Hunterv. Smith, 7 Conn. Sup. 157 (1939).
The unrebutted testimony of the precast erector on the project clearly established that the panels were installed in an appropriate manner, pursuant to the requirements of the contract, and were fastened to the structure in a manner and by intermediate angle system that were either as called for by the contract documents, or were approved by the engineer in order to overcome dimensional problems in the concrete floor slabs. The court finds from the testimony and a visual inspection that the cracks have no structural significance, i.e., the panels are in no danger of breaking apart, spalling, or otherwise falling off the building.
The panels fully complied with the requirements of the CT Page 9051 contract documents. The dimensions of the panels were not uncommon; the reinforcing steel satisfied the strength requirements of applicable design guidelines; the design calculations, drawing, and shop drawings satisfied all applicable standards, including those set forth in the contract documents, also the panels satisfied all tests and inspections performed during the job regarding strength of concrete, rebar placement, and allowable bowing. In short, the panels as designed, fabricated, and installed met all requirements of the contract documents.
While there is evidence of minute cracks in a number of the panels,. there is also evidence that this is not abnormal, but actually a condition to be expected. Gilbane's precast expert at trial, testified that he measured the width of the observed cracks as approximately .0007" on the interior face, and approximately .001" to .002" on the exterior face. These measurements were not disputed by STLP's precast expert at trial. While there is also evidence that there some water has entered the building from the exterior, there is no convincing evidence to the court in the case regarding the source of that water.
Gilbane's expert testified that, in his opinion, rain water could not be entering the building through the cracks at all,
much less in quantities sufficient to create the puddles and stains complained of by STLP and shown in the photographs entered as Exhibit 123. He testified that even epoxy, which is more viscous or "wetter" than water, cannot penetrate a .001" to .002" wide crack even if injected under very high pressures. He further testified that in his broad experience in concrete repair, the narrowest crack he had seen successfully epoxy injected was a .006" crack which was injected under a pressure of 1000 psi. Since rain water would be hitting the exterior .002" wide cracks at a pressure in the range of .33 psi, he opined that there was "no way" it could be penetrating through the cracks and entering the building. The court finds his testimony to be credible and convincing.
While the court can and does find that cracks complained by STLP exist, the court cannot find by the required standard of proof that they constitute a violation of the contract documents or that they have been proven to be the legal cause of leakage that affects the value of the buildings. STLP offered no evidence of actually performing repair work to mitigate its alleged damages from the leaks. STLP bore the burden of establishing any CT Page 9052 actual damage which it allegedly suffered with reasonable probability. The court finds it failed to do so.
Since the cracks have no structural or safety significance and because STLP has not proven to the satisfaction of the court that water is entering the building through the cracks in any significant amounts, the court cannot justify any sums of money to offset Gilbane's claims. STLP was aware that leaks had occurred soon after a substantial completion in 1989 and even though this lawsuit had been commenced as of September of 1991, STLP did not assert this claim until November of 1994. STLP has failed to offer credible evidence establishing damages claimed by it as a result of the allegedly defective precast panels.
CONCLUSION
As to Moliterno: Since the court has found Moliterno's lien to be valid and enforceable and that STLP did not prevail on its special defenses or affirm claims for relief, the amount of the debt is set at $155,000 without interest.
As to Gilbane: The court finds its lien to be valid and enforceable and the debt is set at $770,070 without interest.
RYAN, J. CT Page 9053